Mrs. Alice M. LEAVELL, Executrix of the Estate of Lewis Edward Leavell, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mrs. Alice M. LEAVELL, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. AC–704, AC–705.

United States District Court
E. D. South Carolina,
Columbia Division.

Oct. 15, 1964.

Yancey A. McLeod, William Elliott, Edward Latimer, Columbia, S. C., for plaintiff.

Terrell L. Glenn, U. S. Dist. Atty., George E. Lewis, Asst. U. S. Dist. Atty., Columbia, S. C., for defendant.

SIMONS, District Judge.

Civil Action No. AC–704 was commenced by the filing of the complaint in the office of the Clerk of this Court on April 5, 1961 by Lewis Edward Leavell, Sr., as plaintiff, against the defendant under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b) [1] and § 2671 et seq. [2] for personal injuries and damages allegedly suffered by him caused by the negligent and wrongful acts of the defendant, its agents, servants and employees in the operation of Shaw Air Force Base, Sumter County, South Carolina, and resulting from the testing and maintenance of jet aircraft engines thereon. Mr. Leavell died during August 1961 and his wife, Mrs. Alive M. Leavell, as Executrix of his estate, was duly substituted as party-plaintiff in said action. In its answer to this suit the defendant interposed three defenses: [a] A general denial; [b] Statute of limitations as set forth in Section 2401 of Title 28 U.S.C.; and [c] Lack of jurisdiction of the court in that the cause of action is based upon acts or omissions of employees of the defendant which fall within the exceptions provided in Section 2680(a) of Title 28 U.S.C.

Civil Action No. AC–705 commenced by plaintiff, Mrs. Alice M. Leavell, against the defendant set forth three causes of action. The first and second counts were originally brought under the Federal Tort Claims Act, Supra, for property damages to plaintiff's residence and rental property resulting from the noise, shock, vibration and the resultant interference with the enjoyment and use thereof caused by the testing of jet engines on Shaw Air Force Base in close proximity to plaintiff's said property; at the commencement of the trial plaintiff elected to proceed in these first two counts under the Tucker Act, 28 U.S.C. § 1346(a)

---

1. 1346(b)—Gives district courts exclusive jurisdiction over civil actions for money damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while in the scope of employment, where a private person would be liable according to the law of the place where the act occurred.

2. 28 U.S.C. § 2671 et seq.—Statutes providing for Tort Claims Procedure.

(2) [3], reducing the prayer of each count to $10,000. Her third count was predicated upon the Federal Tort Claims Act, supra, for personal injuries and damages suffered by her as a result of the alleged negligent and wrongful acts of the defendant, its agents and servants, in the operation of said Shaw Air Force Base, and the testing of its jet aircraft engines thereon. To these three counts the defendant interposed the same three defenses pleaded in AC–704 hereinabove.

These two actions were consolidated for trial and tried by me in Columbia, South Carolina on June 17 and 18, 1964.

Although defendant pleaded the affirmative defense that plaintiffs' causes of action were barred by the Statute of Limitations, this defense was not asserted before the court at the time of trial.

From the evidence presented, and pursuant to the provisions of Rule 52(a), Federal Rules of Civil Procedure, I find the facts specially and state my conclusions of law therefrom as follows:

1. The defendant is the owner of a large tract of land in Sumter County, S. C. bordering the northern side of U. S. Highway #76 on which Shaw Air Force Base is located.

2. The plaintiff, Mrs. Alice M. Leavell, who is now 70 years of age, owns two parcels of property on the South side of U. S. Highway #76 in Sumter County, immediately across from said Shaw Air Force Base. One parcel containing three [3] acres has a house located on it, which was used as the Leavell residence for many years until 1933. The other parcel containing two and one-half [2½] acres has a house on it which has been divided into two apartments. This property has been held by Mrs. Leavell as rental property.

3. Both of these properties were acquired by Mrs. Leavell in 1941. At that time, only propeller driven aircraft were operated at Shaw Air Force Base.

4. Mrs. Leavell built a new home in 1963, into which she and her two sons have moved. She suffered a heart attack in December 1962 and in 1963 prior to moving. After the family moved out of the old home, it was rented at various times in 1963 and has been rented since February 1964.

5. Lewis Edward Leavell, deceased husband of Mrs. Alice Leavell, lived with his family in the home across Highway #76 from Shaw Air Force Base from 1941 until his death in the summer of 1961, at the age of 69. He suffered a heart attack for the first time in February 1957 and again in June 1957. He had a previous history of rapid heart and overactive thyroid. Following the June attack, Mr. Leavell had emotional problems.

6. In 1957 Mrs. Leavell bought fifty-eight one-hundredths [.58] acre of land situated in back of her home site for $650.00.

7. The rental property of the plaintiff has remained vacant since October 1957.

8. Prior to 1956, the aircraft inventory at Shaw Air Force Base consisted primarily of RF–84's and RB–57's. The jet engines used in these types of aircraft could be and were tested in an area of the base far enough away from the Leavell residence to cause no inconvenience to the plaintiffs. These aircraft did not have to be tied down while the engines were being tested as the engines were removed from the planes and tested in a "test cell".

9. On January 31, 1956, RB–66's replaced the RB–57's in the Shaw Field inventory and by June 30, 1956, 16 RB–66's had arrived on the base. On May 6, 1957, the F–101 aircraft replaced the RF–84's. Following the arrival of the

---

3. 1346(a) (2)—Gives district courts original jurisdiction concurrent with the Court of Claims over "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, * * * or for liquidated or unliquidated damages in cases not sounding in tort."

F–101's on the base, the engine testing site for the F–101's and RB–66's was changed to the area across from plaintiff's property. This change was deemed necessary because the test cell being used for the RF–84 and RB–57 engines were not large enough to handle the RB–66 and F–101 engines. In addition, the RF–84's and RB–57's remained at Shaw Field for some time after the arrival of the new aircraft and their engines required maximum use of the old test cell.

10. The aircraft operating out of Shaw Air Force Base were used primarily for reconnaissance purposes and were subject to being sent over wide areas of the world, wherever required, with little or no advance warning. Under these circumstances, the maintenance personnel were required to keep 70% of the aircraft operational at all times.

11. In order to keep these aircraft [RB–66's and F–101's] in operational status the jet engines had to be tested at full throttle while in the aircraft for extended periods of time.

12. While the engines were being tested at full throttle, the aircraft had to be tied down on a "jet engine trim pad", which is an area equipped with proper tie-down facilities, surfacing, accessability and clearance.

13. The area on the base most suitable to be used as a "jet engine trim pad" during the period of time in question, 1957 to 1962, was approximately 2,000 feet from plaintiff's property across Highway #76. The decision to locate the "jet engine trim pad" in that area was made by the Base Commander and his staff, following an extensive investigation to determine the area which could most efficiently and safely accommodate the aircraft as a suitable location for testing. The area known as the "Compass Rose" [4] could not be used because

the installation of the tie down rings would have destroyed that facility for use as a Compass Rose. Lt. Col. Barth, witness for the government, testified that the cost would have been prohibitive to make the area near plaintiff's property, being then used as the engine testing site, into a new Compass Rose, as procedures existed prior to 1961 for calibrating compasses. The north ramp area could not be used because of the congestion of buildings and hangers, and the necessity of having sufficient clearance both in front of and to the rear of the aircraft during testing. Any large unpaved area could not be used because the "vacuum cleaner" nature of the jet engine required that the testing area be paved and free of foreign matter which might be drawn into the engine.[5]

14. The location of the jet engine trim pad at the intersection of the east-west and north-south runways, near plaintiff's property, was a temporary measure until the construction of a jet engine test cell, which could accommodate the F–101 and RB–66 engines at the northern end of the field, could be completed.[6]

15. The testing of the engines was carried out by trained aircraft mechanics in strict compliance with official Air Force Technical Orders, and detailed check lists were used for any work performed on the aircraft. The testing took place at all hours of the day and night as required by military necessity.

16. The direction in which the aircraft were pointed during engine testing was determined *by the direction and velocity of the winds*. The nose of the aircraft *had to be pointed into the wind*, give or take 5 degrees, while the engines were being tested, which generally required that the tails of the aircraft be pointed in the direction of plaintiffs' residence and rental property, depending

---

4. A "Compass Rose" is an area used to calibrate compasses in jet aircraft. The aircraft were "turned" in a 360° circle in this area in order to "set" the compasses.

5. Deposition of Stephen B. Mack [Brigadier General, U.S.A.F., Retired] former Base Commander, Shaw Air Force Base, June 4, 1955 to June 1, 1958, pages 16–23, Defendant's Exhibit G–4.

6. Mack Deposition, page 27.

wholly upon wind direction. The noise, shock and vibration to plaintiff's residence and rental property were much greater when the tails of the aircraft being tested were directed toward, rather than away from plaintiff's residence.

17. While testing the engines in the aircraft at this location, the sound pressure level at plaintiff's residence and rental property was extremely high, ranging from 90 to 117 decibals, shaking windows and rattling pictures and dishes, drowning out conversation, radio and television, and making it difficult if not impossible to sleep.

18. Plaintiffs vigorously protested to military officials at Shaw Air Force Base and to U. S. Senator Strom Thurmond about the noise and vibration resulting from the location of the jet engine trim pad in close proximity to their residence and property.[7]

19. A new method to calibrate aircraft compasses had been developed and was available to Shaw Field in 1961, which eliminated the necessity to "turn" the aircraft in a 360° circle in the Compass Rose area. In the fall of 1962 the project was completed to equip this Compass Rose area with tie-down rings to serve as a jet engine trim pad, and the area near plaintiff's property has been used as a test site very infrequently since that time.

20. Neither plaintiff's residence nor rental property were subject to overflights of aircraft at low altitudes or otherwise.

21. At the time the old jet engine trim pad was being used, there was a substantial interference with the use and enjoyment of plaintiff's residence and rental property. However, there were other homes and rental property in the community which also had to endure similar inconvenience. Unfortunately, plaintiff's property was in the area of maximum noise and interference.

22. Plaintiffs rely upon the same acts of the defendant to support both the Tort claims and the Tucker Act claims, to wit, the locating of the "jet engine trim pad" in close proximity to plaintiff's property, the constant testing of the jet engines at that location, and the pointing of the tails of the aircraft in the direction of plaintiff's home and rental property, both being about 2,000 feet from the testing area.

Based upon the foregoing findings of fact, the court makes the following conclusions of law:

■ 1. The Tucker Act claims for property damages are predicated upon a "taking" of said property by the government without just compensation in violation of the fifth amendment of the Constitution of the United States.[8] "Taking" has been defined as that governmental action short of occupancy "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter." United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359–360, 89 L.Ed. 311.

In Batten v. United States, 306 F.2d 580, 583 [10th Cir. 1962] the court said:

"The noise, vibration, and smoke incidental to the operation and maintenance of jet planes disturb the peace and quiet in every residential area located near an airport used by the jets. This disturbance is felt not only by those whose property is crossed by the planes on take-offs or landings but also by those who live outside of the established flight patterns. * * *

"In construing and applying this constitutional provision the federal courts have long and consistently recognized the distinction between a taking and consequential damages. In Transportation Company v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336, the Supreme Court held that govern-

---

7. Plaintiff's Exhibit P–11; Mack Deposition beginning at page 24.

8. See note 3, supra.

mental activities which do not directly encroach on private property are not a taking within the meaning of the Fifth Amendment even though the consequences of such acts may impair the use of the property. The principle was repeated in United States v. Willow River Power Co., 324 U.S. 499, 510, 65 S.Ct. 761, 89 L.Ed. 1101, the Court saying that 'damage alone gives courts no power to require compensation.' "

2. Plaintiff claims that there has been an actual "taking" of her property resulting from the noise, shock, and vibration of the jet engine testing program at Shaw Field, in that her residence became uninhabitable and had to be sold; and that her rental property became vacant and has remained vacant since October 1957, after the Air Force started testing the jet engines in close proximity thereto. It is my opinion, as a matter of law from the evidence presented, that plaintiff has not been deprived of "all or most of her interest" in the subject property, so as to constitute a "taking"; although there was, indeed, a substantial interference with the use and enjoyment thereof during the period May 1957 to November 1962, while the jet engine trim pad was located in relatively close proximity to her home and rental apartments. Although plaintiff's property was located in an area of major noise, there was no actual invasion of her property rights by overflights or otherwise, and any damages suffered by her are no more than a consequence of the operations of the Base. In addition, plaintiff lived in her family residence during the entire period from 1956 to 1963. The Air Force had stopped testing the engines on the trim pad near plaintiff's property in October 1962, except on very infrequent occasions.[9]

3. In United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, and Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585, both involving claims for property damages under the Tucker Act, recovery was allowed because the landowner's property was actually crossed by low elevation flights of military planes on take-offs and landings. In our case there has been no invasion of plaintiff's property by military aircraft; recovery is being sought only for noise, shock and vibration. This court has found no case that holds the government liable in substantially the same situations, in the absence of a physical invasion of a landowner's property amounting to a trespass on the surface or the airspace above.

4. I conclude that this case is controlled by the principles of law enunciated in Batten v. United States, supra. In that case, the facts were strikingly similar to the instant case, except that plaintiffs therein did not allege that any home had been made uninhabitable or that any plaintiff had been forced to move because of jet noise, vibration and smoke. In view of the court's finding herein that there has been no "taking" of plaintiff's property in the legal meaning, the rationale in the Batten case is determined to be controlling here. In the Batten case, 306 F.2d at 584, 585, the court said:

"In Causby the Supreme Court held that the continuous invasions of the airspace superadjacent to the property of the landowner by military planes taking off and landing at a nearby base was 'in the same category as invasions of the surface' and that the damages were not 'merely consequential' but 'the product of a direct invasion of respondent's domain.' The plaintiffs argue that the actual damage in Causby resulted from noise and vibrations and that if recovery is permitted for sound and shock waves traveling vertically, it should also be allowed for such waves traveling laterally. The unacceptability of this theory was demonstrated in Nunnally v. United

---

9. Testimony of government witness, Lt. Col. Barth.

States, 4 Cir., 239 F.2d 521, where recovery was denied because of diminution in value of a recreational cottage by practice bombing on an adjoining federal proving ground. The Fourth Circuit pointed out that there was no physical invasion of the plaintiff's property and that there was at the most a 'sharing in the common burden of incidental damages' because the annoyance was the same as that to which everyone living in the vicinity was subject to varying degrees. The court said that to permit recovery would be to obliterate the carefully preserved distinction between 'damage' and 'taking.'

"We are cited to no decisions holding that the United States is liable for noise, vibration, or smoke without a physical invasion. In Causby, Griggs, and a number of lower court decisions such as Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269; Herring v. United States, 162 F.Supp. 769, 142 Ct. Cl. 695, and Matson v. United States, 171 F.Supp. 283, 145 Ct.Cl. 225, there were regular flights over the property. Absent such physical invasion recovery has been uniformly denied."

" *   *   * The vibrations which cause the windows and dishes to rattle, the smoke which blows into the homes during the summer months when the wind is from the east, and the noise which interrupts ordinary home activities do interfere with the use and enjoyment by the plaintiffs of their properties. Such interference is not a taking. *   *   * As we see the case at bar, the distinctions which the Supreme Court has consistently made between 'damages' and 'taking' control and compel denial of recovery." [Footnotes omitted].

5. The Fourth Circuit speaking through Chief Judge, Parker in Nunnally v. United States, supra, 239 F.2d at pages 523, 524 said:

"Plaintiff admits that he must show a physical invasion of his property before he can recover in this case. He claims that the government has invaded or exercised dominion over his property in two ways: by the noise and shock of test explosions, and by the flights of aircraft over the island.

"The rule, that 'acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision', was stated by the Supreme Court in Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336."

6. The recent case of Bellamy v. United States of America, 235 F.Supp. 139 [E.D.S.C. Florence Div., July 1964], involved a claim to recover damages for an alleged taking of plaintiff's property by the United States in connection with the operation of the Myrtle Beach Air Force Base. The factual situation was similar to the instant case, i. e., noise and vibration from the testing of jet engines allegedly damaged plaintiff's home and property, interfering with their use and enjoyment. The case was tried July 1, 1964 before Judge Martin. Defendant's motion for summary judgment was granted upon the controlling principles of law in the Batten case, supra and cases cited therein.

7. I find that the damages here are merely a consequence of the operation of Shaw Air Force Base by the defendant, and as stated by the court in United States v. Willow River Power Co., supra, "damage alone gives courts no power to require compensation *   *   *. [They] may be compensated by legislative authority, not by force of the Constitution alone."

In accordance with the foregoing principles of law, I conclude that judgment should be entered in favor of the defendant as to plaintiff's Tucker Act[10] causes of action; and it is so ordered.

■ 8. The claims for personal injuries to the plaintiff, Alice M. Leavell, and to her deceased husband are brought pursuant to 28 U.S.C. § 1346(b), Tort Claims Act.[11] This act may be invoked only on a " 'negligent or wrongful act or omission' of an employee" [of the government]. See Dalehite v. United States, 346 U.S. 15, 44, 73 S.Ct. 956, 972, 97 L. Ed. 1427. The plaintiff has the burden of proving such negligent or wrongful act or omission, and such cannot be based upon the assumption that the United States and its agents have or should have unlimited funds available to accomplish that which is most desirable for all persons concerned.

■ 9. The legislative history of the Tort Claims Act discloses that it was not intended that the Government be held liable for errors in administration or in the exercise of discretionary functions; and that 28 U.S.C. § 2680(a)[12] was included in the Act to assure protection for the government against liability for such acts. Dalehite v. United States, supra, at 24–30, 73 S.Ct. 956.

10. During the trial of these actions, counsel for plaintiffs argued that the acts of the military officials at Shaw Air Force Base complained of herein by plaintiffs were "operational decisions", not "policy decisions", and therefore did not come within said exception to the Tort Claims Act, 28 U.S.C. § 2680(a): Eastern Air Lines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 [1955].

Counsel for plaintiffs also cited the case of White v. United States, 317 F.2d 13, 17 [4th Cir., 1963] wherein the court said:

"While the policy embodied in the Veterans Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to an individual case is not within the category of policy decisions exempted by the statute. The application of that policy to the individual case is an administrative decision at the operational level which if negligently done will make the Government liable."

It is to be noted that the White case is in accord with a number of decisions that have held the government liable where improper medical treatment or custodial care has been rendered in a government facility. See Costley v. United States, 181 F.2d 723 [5th Cir., 1950]; United States v. Gray, 199 F.2d 239 [10th Cir., 1952]; Dishman v. United States, 93 F. Supp. 567, [D.C.Md., 1950]. The White case can be said to be applicable in the subject action only to the extent that it is authority for the proposition that the Court of Appeals for the 4th Circuit recognizes the distinction between "operational decisions" and "policy decisions".

■ 12. The decision as to where to locate the "jet engine trim pad" was a discretionary function which falls within the exception [28 U.S.C.A. § 2680 (a)] to the Tort Claims Act and cannot be the basis of a tort claim against the United States. In Dalehite, supra, 346

10. See Note 3, supra.

11. See Note 1, supra.

12. "The provisions of this chapter and section 1346(b) of this title shall not apply to any claim based upon an act or omission of an employee of the Government, exercising due care, in the exe-

cution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

U.S. at 35–36, 73 S.Ct. at 968, the Supreme Court said:

> "It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680[a] would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." [Footnotes omitted.]

In a very recent unreported case from the Southern District of California, Nichols v. United States, 236 F.Supp. 241, decided April 1, 1964, cited here by the U. S. Attorney, the court held on facts substantially the same as in the instant cases that:

> "This court does not have jurisdiction of the cause of action under the Tort Claims Statute by reason of 28 U.S.C. 2680(a), as the selection of the place to test jet engines is a discretionary function of the defendant."

The case of Barroll v. United States, 135 F.Supp. 441, 449 [D.C.Md.1955], was an action by a property owner under the Tort Claims Act to recover damages to the home of plaintiff allegedly caused by testing of explosives at Aberdeen Proving Ground, Maryland. In finding for the Government, the court said:

> " * * * The selection of the place where a proving ground should be located is clearly within the exceptions set out in 28 U.S.C.A. 2680[a]. So are such matters as the size of the cannon, the amount and character of the explosives to be included in the charge, the conditions under which the tests should be made, and the location of the firing positions. * * "

■ 13. The plaintiffs herein have failed to prove that the government employees at Shaw Air Force Base were guilty of any negligent or wrongful act or omission in connection with the program for testing jet engines on the air force installation. The evidence in this case clearly indicates that the tails of the aircraft while undergoing engine testing were not intentionally, negligently or wrongfully aimed at plaintiff's property, but were turned in that direction because of the prevailing winds. Plaintiffs argued that the remark, contained in the letter of Major General Fisher dated September 10, 1958 [13] to Senator Thurmond that "In addition, aircraft required for runups in that vicinity will not be pointed in the direction of the Leavell residence", evidenced wrongful acts on the part of the government thereafter to continue to point the tails of the aircraft in the direction of the Leavell residence. This argument is without merit. This letter could certainly not be interpreted as an order to Shaw Air Force Base officials not to point the tails of the aircraft in that direction; and, from the evidence presented at the trial that the wind direction determined the direction of the nose and tail of the aircraft, it is obvious that General Fisher intended to infer that the tails would not be pointed in that direction more than was absolutely necessary. It is therefore,

Ordered that judgment be entered for the defendant as to plaintiffs' Tort Claim causes of action.

13. Letter marked Exhibit "A", deposition Senator Strom Thurmond.