Carrollton A. Roberts, J.
This is an action brought by the plaintiffs as owners of three parcels of land adjoining the Rochester-Monroe County Airport against the County of Monroe for monetary damages and a permanent injunction prohibiting certain jet airplane flights over the plaintiffs’ residences.
The present site of the airport was established by the City of Rochester by city ordinance and commercial operations were started there in 1927. On or about December 30, 1947, the County of Monroe acquired the airport land and buildings from the City of Rochester, entering into possession and management of the airport on January 1, 1948. The County of Monroe since that time has continued to add additional land and has made numerous improvements so that at the present time the combined total acreage of the airport comprises approximately 1,100 acres.
There are five runways at the airport, four of which are presently in operation. The lengths of the runways vary from *63 3,245 feet to 7,000 feet. In January of 1965 commercial jet aircraft operations were commenced at the airport and only two of the runways mentioned are used for jet aircraft. The only runway we are concerned with in this action is the east-west runway, which is also referred to as Runway No. 10-28, and which is 5,500 feet in length, the west end of which is approximately 2,500 feet straight east of the properties owned by the plaintiffs on Beahan Road.
The plaintiffs Dabbert acquired their present property near the airport in October of 1947, approximately 20 years after the airport was first used for commercial traffic and a short while before the County of Monroe acquired the airport. The plaintiffs Cunliffe purchased their property in August of 1948, approximately six months after the county purchased the airport from the City of Rochester. The plaintiffs Lambert acquired their premises in July of 1965, approximately six months after the advent of commercial jet aircraft operations at the airport.
Each of the plaintiffs is claiming that their property has sustained structural damage by reason of excessive vibration caused by overflights of jet aircraft landing and taking off from Runway No. 10-28 and in the process passing directly over their premises at very low altitudes. They further claim that their property has suffered a severe diminution in market value as a result of these overflights, and they are asking monetary damages for these losses and in addition seek a permanent injunction prohibiting jet airplane flights over their premises.
Before proceeding to an analysis of the facts and expert testimony introduced at the trial, an effort must first be made to set forth with as much precision as possible the principal cases both defining and limiting plaintiffs’ cause of action in the case at bar. United States v. Causby (328 U. S. 256) is the leading case. There, claimant owned a chicken farm adjacent to a military airfield. The glide paths to runways on the airfield passed directly over his house and barn within 83 feet of the ground — a distance of 67 feet above his house and 63 feet above his barn. The owner testified that flights came so close they barely cleared the trees; the noise was described as startling and the glare from the plane’s landing lights illuminated the property in the evening. These conditions were alleged by claimant to have destroyed the utility of his property for use as a chicken farm and also to have caused him and his family loss of sleep and nervousness. By reason of these facts, claimant alleged that the United States had taken his property without payment of just compensation. Before the Supreme Court, the United *64 States conceded that if the use and enjoyment of the land over which the planes passed was made uninhabitable, it could be said that a taking in terms of the Fifth Amendment had occurred for which compensation must be paid. On the facts, the court could not find that the land was made uninhabitable, but it did determine that the value of the property was substantially diminished and, on that basis, the court concluded that the action of the defendants constituted a taking.
Griggs v. Allegheny County (369 U. S. 84), considered the question who was the proper defendant in a suit against an airport, i.e., the airport manager, the United States, the offending airline, the county, etc. In Griggs, the Supreme Court, agreeing with the plaintiffs’ theory, held that the county, the owner and promoter of the airport, was the party taking the easement. The government was held to have taken nothing insofar as its function was merely to approve plans formulated locally. In finding for the plaintiff and placing responsibility on the county, the court determined that the airport included not only surface area, but also air space sufficient to allow safe take-offs and landings. Thus, in terms of the Griggs reasoning, every airport takes on the shape of a bowl, the lowest point extending from the center of the surface area of the airport out over the neighboring landscape.
The controversial Batten v. United States (306 F. 2d 580, cert. den. 371 U. S. 955, rehearing den. 372 U. S. 925), involved a claim for compensation not unlike the earlier cases except for the fact that the flight path of the aircraft did not pass directly over the subject premises. Unlike the earlier cases, Batten turned upon the determination of the court that since there was no direct overflight there was no physical invasion of the damaged property and therefore no taking of property compensable under the Fifth Amendment. While the rationale of the Batten case is questionable, we need not further consider it since it is clear on our facts and the county does not dispute that there were direct overflights.
The authority of the foregoing eases defining and limiting the cause of action for an unconstitutional taking has been recognized in New York in Tripps v. Port of N. Y. Auth. (35 Misc 2d 744, affd. 17 A D 2d 472, revd. on other grounds 14 N Y 2d 119; cf. Town of Amherst v. Niagara Frontier Port Auth., 40 Misc 2d 116, affd. 20 A D 2d 627).
Given the cause of action for an unconstitutional taking defined by the eases, the question then becomes what damages are compensable under this theory of action. All of the cases discussed *65 above mentioned that the property must be made uninhabitable by the conduct alleged to be the cause of the damage. While Causby interpreted uninhabitable to mean substantial damage, at least one case expressly mentioned the fact that plaintiff continued to live in her residence during the entire period in question as the basis for holding that there was no taking. (See Leavell v. United States, 234 F. Supp. 734.) Leavell, however, is unnecessarily restrictive insofar as a claimant may be subjected to substantial damage and inconvenience without having the means or wherewithal to move from his property. The better rule of damages is that if a claimant can demonstrate that the value of his property is substantially diminished by reason of the acts complained of, he will have met his burden of proof regarding the cause of action for an unconstitutional taking. (See, for example, Ackerman v. Port of Seattle, 55 Wn. [2d] 400.)
A question presented in the instant case, which may not have been passed upon in prior litigations, is whether one who purchases property after the commencement of overflights and with knowledge of overflights has the same standing to bring suit for an alleged unconstitutional taking as does another party similarly situated who purchases property prior to the commencement of the overflights. There are several analogous situations in other areas of the law which may be considered for the purpose of gaining insight into the solution of this problem. The claim is often made in zoning cases that a variance for the use of property should be granted on the ground of special hardship notwithstanding that the owner and applicant admittedly purchased the property for the use with knowledge that the use in question was prohibited by the zoning ordinance. The rule generally applied, although with occasional exception, is that one who “ knowingly acquires land for a prohibited use, cannot thereafter have a variance on the ground of ‘ special hardship ’ ”. (Matter of Clark v. Board of Zoning Appeals, 301 N. Y. 86, 89.) The problem arises also in cases where one commences suit to abate a nuisance after having come in proximity to the nuisance with knowledge of its existence. Unlike the zoning cases, one who comes to a nuisance generally is not prohibited from bringing an action to later abate that nuisance. Thus the court in Shearing v. City of Rochester (51 Misc 2d 436, 439) commented that: “An owner of property affected by a nuisance may maintain an action to recover his damages, or to abate the nuisance, or both, no matter whether he takes his title before or after the introduction of the nuisance * * * Thus, the ‘ coming to the nuisance ’ on the part of the *66 plaintiff, as the expression is employed, is only a factor to be considered in the over-all picture. ’ ’ While a continuing trespass may not be barred by the Statute of Limitations so long as it continues, it nonetheless may be a defense to an action in trespass that the plaintiff acquiesces in the conduct sought to be prohibited. (61 N. Y. Jur., Trespass, § 15, p. 22; § 29, pp. 37-38.)
While none of the foregoing situations is identical to the instant fact -pattern, it does become apparent that the law tends to treat more harshly the plaintiff who seeks damages by reason of an activity of which he had prior knowledge than one who does not. The question is whether this should be the rule where the theory of action is not claimed in terms of one of the common-law forms of action, but rather is based upon an alleged deprivation of constitutional rights. By analogy to private condemnations, we know that litigants who purchase property in. an area about to be condemned may nonetheless make a claim for damages against the city of State or whatever, notwithstanding their purchase with knowledge of the imminence of condemnation. Private property cannot be taken, either directly or de facto, for public use without payment of just compensation. Regardless of the date of purchase or existence of the complained of condition, an owner cannot be deprived of his cause of action for damage upon proof of a taking. Purchase after the beginning of the complained of condition, while arguably relevant to valuation[1] cannot have any bearing on the right to bring suit. Accordingly, the claim of Mr. Lambert will be considered on the merits with the claims of Messrs. Dabbert and Cunliffe.
In the following paragraphs we shall summarize the opposing proofs with a view to establishing what damage, if any, the plaintiffs have suffered by reason of the overflights.
Each of the owners, Francis Lambert, Arthur Debbert, and James Cunliffe, testified both with regard to alleged physical and environmental damage to their properties. Jet service from the Monroe County Airport dated from January of 1965. While each owner testified in substantially similar language that noise and vibration from piston type aircraft was not very annoying, each agreed that noise allegedly produced by jets was irritating and disrupted normal living patterns. The owners cited essentially the same set of factors as contributing to both the alleged physical and environmental damage, namely, vibrations, noise, landing lights, and fear of crashes. The noise and lights allegedly deprived the owners of sleep, made normal voice and tele *67 phone conversation impossible, and kept the owners in a constant state of apprehension of aircraft crashing into their property. The height of jet aircraft over their property was variously estimated by them as being between 50 and 300 feet.
Physical damage to the subject premises similarly fell into the same categories — cracked plaster and bricks, foundation cracks, trim damage and minor glass damage.
David Baird, a local contractor was called on behalf of plaintiffs to estimate the cost of repairing the physical damage and further to identify the cause of the physical damage he observed. While Mr. Baird was by experience capable of estimating the cost of repairing the alleged physical damage, he was absolutely incompetent either by reason of experience or education and training to draw any conclusion as to the cause of this damage; in fact, he admittedly failed to make any vibration, stress or sound transmission tests. Accordingly, this court has not considered his testimony as probative on the question of causation.
William C. Kane, a licensed real estate broker, was called by plaintiffs to make an estimate of the total diminution in value of the plaintiffs’ properties by reason of the alleged physical and environmental damage. However, Mr. Kane, admittedly did not make an appraisal of the subject properties but rather made only a general estimate of value based only on observation and unexplained judgment. On this basis, taking into consideration inflationary factors since his inspection of the property in 1967, Mr. Kane estimated the total diminution in value as being between $2,000 and $4,000 for each property.[2] While Mr. Kane concluded that the market data comparable sale method of appraisal was improper for the subject properties by reason of their unique locations, he failed to use either the cost or income approach to verify his estimate of damage. Mr. Kane supported his opinion of value by testimony that only one property in the immediate vicinity of the subjects had been sold since 1965 — and this depression in sale activity he attributed to proximity to the airport.
Oliver Angevine, Jr., a licensed engineer with an M.S. in acoustics and vibration, testified on behalf of defendant. Mr. *68 Angevine measured vibrations from actual overflights of the subject properties and concluded that they were of insufficient intensity to cause the alleged physical damage to the subject properties. Mr. Angevine’s conclusions were supported by the testimony of Frohman P. Davis, a licensed professional engineer with a B.S. and M.S. in civil and structural engineering. Mr. Davis carefully inspected and examined the subject properties and concluded that the alleged physical damage could not have been caused by the overflight vibrations. Citing the age of the properties (Lambert’s was some 145 years old, with the Dabbert and Cunliffe homes being some 18-19 years old), Mr. Davis testified that the physical damage was caused by defects in original design and construction, settling, wind pressure and normal depreciation including shrinkage and drying of blocks, lumber, and other component building materials. This court is persuaded by the testimony of Messrs. Angevine and Davis, the only competent acoustical and structural engineering testimony in the record — that the alleged physical damage to the subject properties was caused by a combination of factors other than the alleged overflight vibration and noise.
Unfortunately, the record is not as clear with regard to alleged environmental damage. We have on the one hand the substantially similar testimony of some of the plaintiff owners[3] that jet noise disrupted their normal living patterns and subjected them to constant fear of crashes. Mr. Angevine on the other hand stated that each of the subject properties was subject to noise at levels ranging between 107 and 113 decibels, depending upon the altitude of the overflying jets. He admitted that sustained exposure to noise in excess of 85 decibels could produce serious hearing loss, even deafness. Mr. Angevine, however, qualified this testimony by indicating that the peak noise from overflights in the instant case lasted no more than 35 seconds, with maximum intensity of no more than 10 seconds. He, therefore, concluded that the subject properties were not exposed to the sustained noise necessary for ear damage. Mr. Angevine’s testimony is inconclusive on the question whether noise irritation, while not physically debilitating, was nonetheless sufficiently intense to so disrupt normal living patterns as to make the subject properties substantially uninhabitable. For the answer to this crucial question we must turn to other testimony in the record.
*69 Mr. Lambert’s testimony on noise irritation may be suspect insofar as he admitted a low tolerance for noise. Moreover, despite the noise, Mr. Lambert never listed his house for sale. This latter fact may be unimportant insofar as Mr. Lambert further explained his reluctance to move out in terms of economic disability. Mr. Dabbert had made no effort to list his house since a listing in 1959, a time prior to jet service; likewise, Mr. Cunliffe made no effort to list his property during the period in question. Mr. Kane, plaintiff’s realtor, supported their reluctance to list the properties by his testimony that there was no market for the sale of these properties. Of course, the conclusion implicit in all of this testimony is that the inability to list resulted from the substantially uninhabitable condition of the properties caused by the alleged environmental damage. However, Alvin A. Pfahl, a licensed realtor, who testified for defendant, listed without contradiction, six sales of properties on Beahan Road since 1965 in the immediate vicinity of the subject properties. Further, a study alluded to by both plaintiffs and defendant indicated that while properties within 2,500 feet of the end of runways might be subject to environmental damage sufficient to make them uninhabitable, properties located at distances greater than 2,500 feet would not normally be subject to such damage. The subject properties are located approximately 2,500 feet from the east-west runway, No. 10-28, here in question. Thus, on the basis of the study conclusions, the subject,properties are sufficiently distant from the end of the runway to place them in a marginal area where compensable environmental damage is uncertain, if not unlikely.
There is no question that overflights must subject the subject property owners to some noise irritation. Accepting the testimony of Edwin Houters, the manager of the Monroe County Airport, that jet craft are at an altitude of at least 50 feet when passing over the end of the east-west runway and further applying the accepted FAA standards for altitude regulation set forth in the record to the 2,500 feet separating the homes from the runway, this court must discount the claim of plaintiffs of overflights at 50 to 75 feet over their houses; although the testimony is somewhat inconclusive in this regard, the testimony supports a finding of overflights over the subject properties at anywhere from 250 to 1,000 feet, with closer overflights resulting in every instance on lesser noise level landings rather than on noisier take-offs.
Given the testimony of Mr. Angevine that the noise in question was not sustained for a period likely to produce hearing *70 damage, Mr. Pfaid’s testimony that there was indeed a market for the sale of houses in the vicinity of the subjects since 1965, and the conclusions summarized above in regard to the height of overflights, this court must find that the noise levels, while annoying, were insufficient to render the subject properties substantially uninhabitable and as such compensable as so-called de facto takings. This court has considered plaintiffs’ complaint as stating hut a single cause of action for compensation for an alleged de facto condemnation. In any event there is no proof of any alleged causes of action in continuing trespass or nuisance. While this court has clearly indicated that plaintiffs stated a cause of action, the complaint, as indicated above, must be dismissed for failure of proof.

. See, for example, Vasile v. State of New York (30 A D 2d 1042).

. Although the court does not here rely on the purchase price for any of the subject properties, it is interesting to compare Mr. Kane’s testimony as to the value of the Lambert property, $16,000 to $18,000 after the alleged taking, with the indicated consideration on the recorded deed to Lambert in July of 1965, a public record, of which this court takes judicial notice. Deed stamps and a mortgage assumption indicate a total consideration of approximately $17,000, an amount which may indicate both the before and after market value of the Lambert property, inasmuch as Lambert admittedly purchased when he knew or should have known of the jet overflights.

. The court deems it important to note that none of the wives of the plaintiff owners, each of whom allegedly suffered considerable discomfort by reason of the overflights, testified in corroboration of their husband’s version of the facts on alleged environmental damage.