FRONTIER TOWN PROPERTIES, INC., Appellant-Respondent, *v.* STATE OF NEW YORK, Respondent-Appellant. (Claim No. 45891.)

Third Department, March 16, 1971.

*De Graff, Foy, Conway & Holt-Harris* and *Walter Feldesman* (*John T. De Graff* and *William F. Conway* of counsel), for appellant-respondent.

*Louis J. Lefkowitz, Attorney-General* (*Richard A. Foster* and *Ruth Kessler Toch* of counsel), for respondent-appellant.

STALEY, JR., J. These are cross appeals from a judgment in favor of claimant, entered January 7, 1969, upon a decision of the Court of Claims.

Pursuant to the Highway Law and the Conservation Law, the State on November 4, 1965, appropriated about 134.593 acres of the lands owned by Frontier Town Properties, Inc., the claimant herein. That part appropriated under the Highway Law was for the purpose of the construction of the Northway, and the part appropriated under the Conservation Law for park and recreation purposes. Prior to the appropriation, claimant owned about 408 acres of which 134 acres were located east of Route 9, approximately 232 acres were located west of Route 9 and south of the Blue Ridge Road, and 42 acres were located north of the Blue Ridge Road. By the appropriation the State acquired the 42 acres north of the Blue Ridge Road and about 93 acres of the lands west of Route 9 and lying west of the center line of the

Schroon River. The area located east of Route 9 was not affected by the appropriation, and was not damaged in any degree.

The area west of Route 9 and east of the Schroon River was improved by a theme park, which was named Frontier Town, and had for its theme an early western American town. The theme park structures included among others, a fort and stockade, a school house and church, a two-story blockhouse, a trading post, leathercraft and saddlery shop, a stage station, a railroad station and steam railroad, a rodeo area with spectator stands, a blacksmith shop, stage coach trails, etc. In addition, there were a 27-unit motel and a restaurant seating 175 people. This area had 1,400 feet frontage on Route 9 and somewhat less frontage on the southerly side of Blue Ridge Road. The road frontage was generally at grade with the highway for a depth of 40 to 50 feet where it gradually sloped down to three descending plateau areas.

On the first plateau the motel was located with a parking area. On the second plateau the restaurant, entrance building, parking area and a swimming pool had been developed. The theme park was located on the lowest plateau which remained generally level to the east bank of the Schroon River. The theme park area, which had opened in 1952, and had been gradually enlarged, was improved with numerous buildings and attractions, and other improvements consistent with its main theme, an early western town.

The area west of the Schroon River contained a part of Palmer's Pond, a body of water established by the damming and impounding of the waters of Schroon River, a powerhouse formerly used in connection with the dam, a farmhouse and barn, and the remains of an old community known as Roth's Forge. This area had considerable frontage on Blue Ridge Road which also ran fairly close to the north boundary of Palmer's Pond and about 15 feet above the pond level. The east frontage of the pond was slightly above the pond level, and the south frontage of the pond sloped fairly steeply uphill to a high point of about 1,200 feet above sea level. There were approximately 3,400 feet of pond frontage. That part of this parcel which included the pond and power house was acquired from Niagara Mohawk Power Corporation in March, 1965.

The area of 42 acres north of Blue Ridge Road had about 1,300 feet of broken frontage on the road. The rear of the parcel was mountainous, rising to about 1,250 feet above sea level. About 6 acres of the frontage were reasonably level and developable. The road frontage was opposite and across the road from

Palmer's Pond. This section contained a sand bank with approximately 120,000 cubic yards.

Claimant's president testified as to the contemplated future plans for development of the area west of the Schroon River and south of the Blue Ridge Road for theme park purposes, in conjunction with the existing operation with part of this area to be designated as "Frontiers of Electricity" and "Frontiers of Industry", with the pond area to be known as "Maritime Frontiers". A "Frontiers of Aviation" was to be located east of the Schroon River at an airstrip. Two operators of other theme parks testified on behalf of claimant as experts in the operation of a theme park to the effect that one of the main considerations of such an operation was the availability of land for expansion purposes, citing the need for changes in attractions to maintain an increased attendance.

One of the claimant's appraisal experts divided the total acreage into "heartland" 232 acres, and "perimeter land" 183 acres, and found the highest and best use at the time of the taking was a theme park. He determined the before value of land to be $515,500 assigning $1,500 per acre to the "heartland" area, and $500 per acre to the "perimeter" land. He determined the before value of the buildings and improvements to be $1,284,500, arriving at a total before value of $1,800,000. The after value of the property he concluded to be $330,000, of which he assigned $130,000 to land and $200,000 to buildings and improvements.

The second appraisal expert for claimant testified that he attempted to use three approaches to value. Although he could find no sales of operating theme parks as a comparable in following the approach of comparable sales, he asserted that "as a simulation to this approach I contacted owners of theme parks to get their opinions as to what comparable sales values might be." The second approach to valuation is what he called the "cost approach". He testified that in this approach he relied on claimant's other expert "for cost or reproduction cost new, less depreciation, of buildings and of land." His so-called "cost method" was in reality a sales method of valuation as to the land, because he testified that he based the land values on claimant's other expert's analysis. His third method of valuation was the "income or economic approach" which utilized the "discounted cash flow method". This method of valuation required the appraiser to project the future income and costs of the theme park including the cost of constructing the attractions which were allegedly proposed for the land taken by the State. In doing so, he considered increased attendance, if the

park were expanded as contemplated, the future income to be derived, the cost of development of the area, and arrived at a before value of $2,093,500. He concluded that the taking precluded the possibility of adding new attractions; that the 12-month period ending on August 30, 1970 would be the last year of profitable operation; and that a prudent person would abandon operations on April 30, 1970. He then determined the after value of the property to be $383,000.

One of the State's appraisers divided the claimant's property into three parcels finding (1) the area west of Route 9, south of the Blue Ridge Road, and east of the Schroon River to have a highest and best use as a theme park; (2) the area east of Route 9 as commercial, residential and recreational development land; and (3) the land west of the Schroon River as recreational and residential development land. In his opinion the highest and best use after the taking did not change. He arrived at a before value of $648,500 and an after value of $624,300.

The other State appraiser, who was also involved in the operation of a theme park, indicated that the highest and best use of the property prior to the appropriation was (1) the area west of Route 9 and south of Blue Ridge Road as a theme park; (2) the area east of Route 9 for commercial development and timber; and (3) the area north of Blue Ridge Road for timber and sand. He determined that the highest and best use of the land remaining after the appropriation was not affected directly or indirectly by the appropriation. He found a before value of $535,600, and an after value of $513,300.

The Court of Claims determined the before value of the area east of Route 9 (134 acres) to be $48,840 assigning $11,840 to the land, and $37,000 to the improvements. The after value of this parcel was found to be the same. The before value of the area west of Route 9 and south of the Blue Ridge Road was determined by the court to be $837,759. In this area the court considered 198 acres to have a highest and best use as theme park land with a value of $600 per acre and 34.09 acres as having a highest and best use as mountainous backup land for the theme park with a value of $100 per acre, arriving at a total before land value of $122,209. The buildings and improvements in this area were determined to have a before value of $715,550. In this area the State appropriated 58.593 acres of theme park land valued at $600 per acre ($35,155.80) and 34.09 acres of backup land valued at $100 per acre ($3,409). A farmhouse, barn and outbuildings located on the area appropriated were determined to have a value of $10,000 and land improvements to have a value of $1,500. The

dam located in the appropriated area was determined to have a value of $30,000 and the powerhouse and fixtures therein were determined to have a value of $5,000. The court thus arrived at direct damages in this area by reason of the appropriation of $85,064.

The area north of the Blue Ridge Road was determined by the court to have a before value of $4,500. In arriving at this value the court assigned $3,000 to 6 acres of frontage land, and $1,500 to 35.91 acres of rear mountainous land. This entire area was within the appropriation resulting in direct damages of $4,500. Total direct damages were determined to be $89,564.

The court further determined that the appropriation south of the Blue Ridge Road caused consequential damages to the remaining theme park land but not to the motel and land improvements directly related to it. Consequential damages were determined to be $90,000. In arriving at this determination the court came to the conclusions that geographic expansion was vital to the success of the theme park; that prime expansion area was appropriated; that expansion of the park would now require a realignment of the present operation; that the proximity of the Northway to the northwest portion of the park would curtail effective expansion in that area; and that claimant could continue a successful theme park operation on its remaining property, but of a lesser quality because of the loss of the scenic beauty of the Schroon River, and of the scenic beauty and multiple uses of Palmer's Pond. Total damages were, therefore, found to be $179,564.

On this appeal claimant contends that the court erroneously determined that the expansion program could be conducted on the east side of the Schroon River; that the court improperly interpreted the meaning of a reservation and covenant in the deed from Niagara Mohawk Power Corp.; that the court grossly undervalued the improvements on the appropriated areas; that the court made no allowance for claimant's supply of sand, gravel, and topsoil; that the court's depreciation of the park buildings was unrealistic and improper; that the court erred in rejecting opinions of claimant's experts; that the court's after value of claimant's property was excessive; and that the judgment should be increased to $1,740,000.

The trial court rejected the evidence of claimant's first expert appraiser because his land values were based on comparable sales, none of which were larger than two acres, and his valuations were not supported in the record by acceptable adjust-

ments of such sales which the court concluded were based on his "naked unsupported opinion". His testimony as to before value and after value of improvements was also not sufficiently explained, particularly in regard to the reduction in value of the improvements on the property remaining after the taking. Since his valuations were not adequately supported, they are entitled to little or no consideration. (*Fonda, Johnstown & Gloversville R. R. Co.* v. *State of New York*, 29 A D 2d 240; *Katz* v. *State of New York*, 10 A D 2d 164.)

Claimant's other expert valued the subject property by averaging three valuations of which two were based on unacceptable land valuations of the first expert appraiser and the speculative opinions of the two theme park operators, and third was his "income or economic approach". This latter approach was basically a capitalization of income dependent on a computation of future sales and future expenses. His valuations of the improvements in the appropriated area were based primarily on a projected development of the theme park. The improvements were not in use as attractions and, at the time of the appropriation, the only plans for development of the area were in the mind of the president of the claimant corporation. The plans for the construction of new attractions were at best meager, since they consisted of only a few drawings, a brochure and some research. The evidence as to probable attendance and increased revenue in the event of such development upon which the witness' valuations were essentially based, was highly speculative and insufficient to support such valuations. (Cf. *Arlen of Nanuet* v. *State of New York*, 26 N Y 2d 346.)

The record supports the conclusion that a change of attractions is or may be vital to the successful operation of a theme park, and such change need not necessarily be the expansion into a new area to establish a new theme, but could also be such things as a new pageant or addition of different types of "rides". The remaining land was susceptible to such change and the court properly concluded that claimant could expand its program on the remaining land. We see no error in the court's interpretation of the covenant in the deed from Niagara Mohawk Power Corp., insofar as it determined that claimant could not use the impounded waters for power purposes or for the generation of electrical energy. In any event, the court determined that this area had a highest and best use for theme park purposes and valued it as such. Thus,

whatever the court's determination as to the reservation and covenant, it had no effect on its valuation.

The court further awarded to claimant the value of the dam in addition to the value of the land improved with the lake. This part of the award amounts to dual compensation and cannot be sustained. (See 4 Nichols, Eminent Domain [3d ed.], § 13.12, subd. [1], pp. 366, 367 and § 13.23, pp. 428–432.)

If we accept the trial court's award for that part of the land appropriated having a highest and best use as theme park land, the value of the dam must be subtracted leaving a total award for direct damages of $59,564.

The court awarded consequential damages to the remaining land east of the Schroon River, south of Blue Ridge Road, and west of Route 9. This part of the award can only be substantiated upon a finding that the frustrated plans of expansion were absolutely vital to the future success of theme park. The record does not support this conclusion. Further, special damages may not be awarded for the frustration of future plans. (4 Nichols, Eminent Domain [3d ed.], § 14.241, subd. [4], p. 575; see, also, *Tobin Packing Co.* v. *State of New York*, 26 A D 2d 986.)

The State accepts the court's award for the appropriation of the dam ($30,000); the powerhouse and fixtures ($5,000); the farmhouse, barn and land improvements ($11,500); the land north of the Blue Ridge Road ($4,500), but contends that the land appropriated south of the Blue Ridge Road should be valued at $100 per acre ($9,267.50), or a total award of $60,267.50.

Since the damages awarded improperly reflected damages for loss of the dam and for consequential damages, the award should be reduced to the sum of $60,267.50, which amount the State concedes to be the amount of damages.

The judgment should be modified, on the law and the facts, by reducing the amount of damages awarded to $60,267.50, and, as so modified, affirmed, without costs to defendant, State of New York.

HERLIHY, P. J., GREENBLOTT, COOKE and SWEENEY, JJ., concur.

Judgment modified, on the law and the facts, by reducing the amount of damages awarded to $60,267.50 and, as so modified, affirmed, without costs to defendant, State of New York.