OPINION OF THE COURT
Frank S. Rossetti, J.
The two claims here arise from the partial appropriations of airspace above land owned by each of the named claimants, pursuant to section 1267-a of the Public Authorities Law and section 30 of the Highway Law, under maps entitled Avigation Easement, Development of Republic Airport and Republic Transportation Center, Farmingdale, Long Island-Town of Babylon, County of Suffolk, State of New York, for use of Metropolitan Transportation Authority. The map in the Kupster claim (Claim No. 58566) was designated Claim Map No. 319 and the map in the Schettini claim (Claim No. 58572) was designated Claim Map No. 308, both maps being described as a portion of Appropriation Map No. 300R-1.
The two appropriations here were of permanent easements for avigation purposes of the airspace over all of the respective subject properties’ land areas. Basically, the taking maps defined planes above the properties and the said easements encompassed the airspace above the planes. These individual planes were part of a larger, general avigation easement plane rising upward and outward from Republic’s runway 14 at an *846 angle of one foot up (vertical) for every 50 feet out (horizontal). This general plane started at ground level from a beginning line perpendicular to runway 14’s centerline and 850 feet back (southeast) from the runway’s northwest end. It extended out and up at the said angle (50:1) and ended at an ending line 50 feet above the ground and 2,500 feet out, horizontally, from the beginning line. It was centered on the runway centerline and the prolongation thereof and was trapezoidal in shape, being 1,000 feet wide at the ground level beginning line and 1,700 feet wide at the 50 foot high ending line. Apparently, this genéral plane was for a runway clear zone required for Federal funding of airport improvements. (See 14 CFR Part 152, 152.1, 152.9, 152.11, 152.29, 152.41, 152.45 [c] [14], 152.47 [a] [5], 152.67, 152.85, 152.107 [a], App A, subd 2 [a].)
The individual easement taken above the Kupster property (Claim Map No. 319) ranged from 37 feet above the property’s southeast corner to 42.7 feet above its northwest corner.[1] The easement cleared the Kupster building by about 20 to 23 Vi feet. The only object protruding through the easement plane was the 47-foot oak tree. It extended about 7 feet above said plane.
The easement taken above the Schettini property ranged from approximately 37 feet above the property’s southeast corner to about 41 Vi feet above its northwest corner. The easement cleared the restaurant by about 18 Vi to 19 Vi feet, *847 except for the air conditioning units which it cleared by approximately 14 feet.[2]
The positions of the parties can be stated briefly. Claimants contend that the height restrictions imposed by the easements and the noise from aircraft overflights within the easements consequentially damaged the subject properties. Claimants’ appraiser found these damages (which he denominated severance damages) to consist of cost-to-cure damages (for soundproofing) and consequential damages to the land and building as cured. He thus found decreases in the properties’ land and building values after the taking, but did not find any change in highest and best uses of the properties as cured (he found such before and after uses to be offices and merchandising space for Kupster and a restaurant for Schettini).
The State found the takings had no effect on the properties’ market values. Chief among its reasons for finding no consequential damages were: (a) Federal Aviation Administration regulations had previously restricted the use of or taken the airspace above the properties down to heights lower than those taken by the easements; and (b) any increase in noise resulted from increases in air traffic, particularly jet traffic, and not from the imposition of the easements. Defendant’s appraiser thus found the properties’ values and highest and best uses unchanged (he found such uses for both properties to be any light industrial or commercial use in accordance with the zoning, including the present uses).
An important preliminary is the delineation of the nature of the subject easements. Certainly the State cannot be accused of being unduly prolix in the easements’ descriptions. Nonetheless, we think the scope of the easements is clear. Each map is entitled "Avigation Easement” and describes the permanent easements taken as "for Avigation Purposes”, without any exception or limitation. Also, each claimant is described as "Former Reputed Owner of Avigation Rights.” Avigation is defined as navigation of aircraft. (Merriam-Webster’s 3d New Int Dictionary [1976 unabr ed], p 151.) Therefore, although the only precatory language in the taking maps pertains to objects extending above the easements’ planes, we believe the subject easements must be considered full ones for general avigation purposes and not merely obstruction clear *848 anee easements. (See United States v Brondum, 272 F2d 642, 644-645; Greater Baton Rouge Airport Dist. v Hays, 339 So 2d 431, 434-435 [La App].) Under familiar eminent domain principles, the State’s taking is deemed to encompass all that it has a right to do under the terms of the easement. (See Wolfe v State of New York, 22 NY2d 292, 295; Morton v State of New York, 8 AD2d 49, 52; Spinner v State of New York, 4 AD2d 987, 988.) Both parties proceeded herein on the basis that the easements taken were full avigation ones (if they were merely obstruction clearance easements, all the reports and testimony on noise damage would have been immaterial and unnecessary). Accordingly, the court so finds.
A second preliminary, and one which eliminates one of the State’s principal reasons for finding no consequential damages, concerns the Federal Aviation Administration (F.A.A.) regulations applicable to the subject properties. These regulations concern objects affecting navigable airspace. (14 CFR Part 77.) They were promulgated on May 1, 1965, pursuant to provisions of the F.A.A. Act of 1958 (US Code, tit 49, ch 20, particularly §§ 1348, 1501), and became applicable to Republic Airport when it became an "[ajirport available for public use” (see 14 CFR 77.2, 77.13 [a] [2] [i], [a] [5] [i], 77.21 [c] ). Republic became such in 1969 at the latest.[3]
As applied to the subject properties, these regulations required (and apparently still require) claimants to give the F.A.A. notice of any construction or alteration which would extend higher than existing buildings. (See 14 CFR 77.13 [a] [i], 77.15 [a].) Further, if the construction or alteration would extend higher than the applicable takeoff and landing approach surface, it would be an obstruction to air navigation. (See 14 CFR 77.23 [a] [5].) Said surface was an imaginary plane extending upward and outward from at or beyond the end of the runway at a specified angle, in a manner similar to the State’s general avigation easement plane herein. (See 14 *849 CFR 77.25 [c], [d].)[4] The F.A.A. would then determine additionally if such obstruction was or was not a hazard to air navigation (see 14 CFR 77.19 [c] [2], [3], and Subparts D and E; see, also, Air Line Pilots’ Assn. Int. v Department of Transp., Fed. Aviation Admin., 446 F2d 236, 237-238). However, in this proceeding the key question concerning these regulations, and one the State apparently overlooked, is what effect they, and possible findings of "hazard” under them, have on the market value of the subject properties. The answer is they apparently have no effect, or at least they have no effect supported by the trial record herein. This is because, as applied to the claimant landowners (and their property), a finding of hazard is advisory only and would not by itself prevent any construction or alteration found to be a hazard. (See Illinois Citizens Committee for Broadcasting v Federal Communications Comm., 467 F2d 1397, 1401.)
While this result may appear somewhat unexpected, we believe it a proper one. First, there are no provisions in either the 1958 F.A.A. Act or the regulations thereunder authorizing or effectuating enforcement of a hazard finding against private landowners.[5] Second, the judicially perceived Congressional intent relative to obstructions and/or hazards is that they be limited only through voluntary compliance by the private landowners affected. (See Air Line Pilots’ Assn. Int. v Department of Transp., Fed. Aviation Admin., supra, p 242.) Both of the above are consistent with the current Federal policy not to have the Federal Government assume any liability relative to takeoff and landing rights (see, e.g., British Airways Bd. v Port Auth. of N. Y., 558 F2d 75, 81-82, the latest decision in the ongoing Concorde-S.S.T. controversy) and this policy is consistent with the United States Supreme Court ruling that liability for aircraft noise damage should be imposed on the owner and *850 operator of the airport, not the Federal Government (see Griggs v Allegheny County, 369 US 84, 89-90). Thus, while the airspace above the F.A.A. airport landing and takeoff approach surfaces (see p 848, supra) is part of the Federal navigable airspace, and thus part of the Federal public domain (see, generally, US Code, tit 49, §§ 1301, 1304, 1508), the Federal Government has evidently decided not to fully pre-empt its rights of control therein. A possible reason for this Federal reticence is that a full Federal pre-emption would most likely subject the Federal Government to the inverse condemnation suits currently brought against local airport owners, or require it to appropriate avigation easements like the ones here. Aside from the expense, such suits or appropriations would lead to what could be considered an excessive Federal involvement in matters more properly resolved by local authorities. Whatever the reason, we think the conclusion that the subject regulations did not directly restrict private landowners is consistent with evident Federal intent and policy.
An additional support for this conclusion is found in other, related F.A.A. regulations. As noted, the seeming purpose of the instant takings was to obtain Federal funding (see p 846, supra). The F.A.A. regulations pertaining thereto (14 CFR Part 152) set out the general requirement that an airport applying for such funding own or acquire "adequate property interest^]” for runway clear zones (see 14 CFR 152.9, 152.11). An adequate property interest appears to be nothing more than an obstruction clearance easement with right of entry for such clearance. (See 14 CFR 152.11 [h].) A runway clear zone is defined simply as a specified part of the applicable Part 77 approach surface. (See 14 CFR 152.9 [b].)[6] If the F.A.A. believed its Part 77 regulations restricted land use as the State apparently believes they do, it would have been superfluous for the F.A.A. to have included the runway clear zone requirement in its Part 152 regulations. As the administrative agency which promulgated and administers the Part 77 and Part 152 regulations, the F.A.A.’s interpretation thereof is entitled to great weight. (See, generally, 1 NY Jur, Administrative Law, §§ 88, 108.) Here its interpretation of its regulations is evidently contrary to that of defendant and consistent with the court’s conclusion.
Therefore, while the Part 77 regulations may have direct *851 effects on others (see, e.g., Chronicle Pub. Co. v Federal Communications Comm., 366 F2d 632), they do not have such effects on the claimant landowners or their properties. Further, while it is possible the regulations may have indirect effects on said landowners and property through the "moral suasion” power of the regulations and findings thereunder (see Air Line Pilots’ Assn. Int. v Department of Transp., Fed. Aviation Admin., 446 F2d 236, 240-242, supra), no evidence was presented of any such effect on the subject properties. Accordingly, we find defendant’s contentions relative to the effect of these regulations on the subject properties legally unsupported.
Proceeding to the central concern in this case, the consequential damages[7] resulting from the takings, we note that to the court’s knowledge, this is the first New York case evaluating formal de jure appropriations of avigation easements. Other New York cases have considered avigation easements, but only in the context of inverse condemnation suits (see Cunliffe v County of Monroe, 63 Misc 2d 62, 64). Most of the general law concerning such easements has evolved from inverse condemnation cases and although such suits are analogous to the instant proceedings, there are significant differences between them. For example, inverse condemnation requires a showing of substantial damage from overflights before a taking will be found. (See United States v Causby, 328 US 256, 265-267.) In a de jure appropriation, the fact of the taking is generally undisputed and the legally compensable damages resulting therefrom, in whatever amount, are recoverable. It has also been opined that inverse condemnation, as a legal theory and basis for the recovery of de facto overflight noise damage, has effectively absorbed other legal doctrines applicable to such damage, to wit, trespass and nuisance. (See 39 J of Air L 81, 83.) Thus, in resolving the various issues at bar, rules evolved from inverse condemnation cases, as well as from normal appropriation cases, have been applied only to the extent they accord with fundamental principles of eminent domain, giving appropriate consideration to the atypical aspects of avigation easements.
*852 We perceive nothing in the nature of avigation easements, or in the proof presented, to warrant variance from the general measure of consequential damages, to wit, the diminution of market value, as reflected in the difference in market value before and after the takings. (See, generally, 4A Nichols, Eminent Doimain, § 14.232; cf. id., p 14-94.) The two elements of such damages which claimants contend make up the said difference here are those arising from: (a) the easements’ height restrictions; and (b) aircraft overflight noise. As hereinafter explained, we find both elements legally compensable, but neither was shown by proper legal proof to exist with respect to the subject properties.
Considering the height restriction damages initially, we believe such restrictions are sufficiently comparable to similar zoning restrictions that the effect of the easements’ height restriction on market value can be assumed. (See, generally, 4 Nichols, Eminent Domain, § 12.322.) Thus there is no per se legal impediment to damages arising therefrom, but of course the existence, as well as the amount, of such damages must be shown by legally sufficient proof. Such was patently absent here.
First, while claimants’ basic contention concerning these restrictions was they would prevent any post-taking vertical expansion of claimants’ existing buildings, neither claimant demonstrated that a second story could not be built under the respective easements. The Kupster easement cleared the top of the building there by 20 to 23 Vz feet and the building’s first story was only 18 feet high. Nothing was shown to indicate a second story would require more than that clearance. The Schettini restaurant had less clearance (18Vz to 19Vz feet above the building) and the first story was somewhat higher (approximately 20 feet). Nonetheless, there was again no proof that a second story could not be built within this clearance.[8]
Second, it was not shown there was sufficient market demand in this area for commercial-industrial or restaurant properties to justify the expense of vertical as opposed to horizontal expansion. Defendant’s appraiser indicated that *853 buildings in the area were predominantly one story and that the few two-story buildings were no more than 30 to 32 feet in height. Claimants’ proof failed to show a shortage of compara-, ble buildings or other factors that would make it economically reasonable to expand the subject properties by putting on a presumably more expensive second or third story rather than by merely adding a horizontal addition. In fact, it was not shown that any expansion was economically reasonable (with respect to the Schettini property, see "Fourth” par, infra).
Third, claimants failed to show that a second story would not be proscribed by the zoning requirements relative to on-site parking. Kupster had approximately 28,000 square feet available for parking and, of this, about 22,000 square feet was allocable to the existing building. Thus a second story of only about 6,000 square feet would be permissible. As to Schettini’s restaurant the existing seating capacity (including the addition, but not the bar-lounge) was a minimum of 475 people. Hence, 67 parking spaces were required. Defendant’s appraiser opined that 50 spaces could be provided through the use of attendant parking and arguably such a procedure could also supply the additional 17 spaces required. However, claimant Schettini presented nothing to indicate that other parking could be provided to permit any further expansion.
Fourth, claimants presented absolutely no evidence of any plans for future expansion, vertical or otherwise. In fact, as of vesting, Mr. Schettini was in the course of completing an addition which more than doubled his restaurant’s capacity and usable area. He gave no indication he had further plans to expand. The court thus considers any expansion plans to be at best only a gleam in claimants’ appraiser’s eye. As such, they were speculative and nonfactual and any putative damages therefrom are impermissible. (See Oneonta Center Assoc. v State of New York, 54 AD2d 993.)
Finally, even if plans for expansion did exist, damages therefor could not be awarded under the familiar rule that damages for frustration of business plans are not compensable. (See Specialty Foods Corp. v State of New York, 46 AD2d 989; Frontier Town Props, v State of New York, 36 AD2d 148, 155, affd 30 NY2d 892.) On all the foregoing, the court finds claimants have failed to prove their entitlement to consequential damages due to the easements’ height restrictions.
The second claimed element of consequential damages, *854 noise damages, was the preeminent issue in these cases and again we could find no legal authority for barring such damages per se. In highway appropriations, it is unclear whether noise damages are allowable as a discrete element of consequential damages, but it is clear they may be considered in conjunction with other damages. (See City of Yonkers v State of New York, 40 NY2d 408, 412-413; Dennison v State of New York, 22 NY2d 409.) More pertinent to aircraft noise are cases involving railroad appropriations where noise damages have been allowed as a matter of course. (See, generally, 4A Nichols, Eminent Domain, § 14.2462, pp 14-267 through 14-270; vol 5, § 16.102, pp 16-68, 16-69.) This court would be ignoring common experience if it failed to note there is a quantum difference between highway and train noise and a further such difference between train and aircraft noise. Thus the compensability of consequential aircraft noise damages would seem to follow a fortiori from the compensability of train noise damages. It has been judicially held that noise from aircraft overflights can have substantial, measurable effects on market value (see, e.g., Klein v United States, 7 Av Cas 17,186, 17,187) and the State here has made no argument for the barring of damages from such noise as a matter of law. We therefore find that it is legally permissible to allow consequential damages due to aircraft overflight noise in a de jure avigation appropriation proceeding.
In making this finding, we have considered and rejected defendant’s remaining chief argument against allowing consequential noise damages, to wit, such damages, if any, arose not from the easements, but from an increase in aircraft traffic in general and jets in particular. This argument, while facially appealing, overlooks the nature of the easements herein and the State’s liability arising therefrom.
As observed, the State, as owner and operator of Republic Airport, is liable for noise damages from aircraft overflights to and from the airport (see Griggs v Allegheny County, 369 US 84, 89-90, supra). Put another way, prior to the imposition of the subject easements, the State had the right to fly aircraft over claimants’ properties (within the Federally defined navigable airspace — see US Code, tit 49, § 1304), but this right to fly over did not include the right to make damage-causing noise without liability, even though such noise was incidental and necessary to such flights. This latter liability was enforceable in an inverse condemnation suit where, if proper noise *855 damages were shown, a taking would be found, with the State being deemed to have appropriated an avigation easement by and for aircraft overflights.[9] In judicially enforcing claimants’ constitutional rights to just compensation, the courts would be requiring the State to pay for this right to make noise.
Considering the above-described judicial determinations of what an avigation easement is deemed to include (see, also, United States v Brondum, 272 F2d 642, supra; Greater Baton Rouge Airport Dist. v Hays, 339 So 2d 431 [La], supra), and what legal effect such an easement is deemed to have vis-á-vis liability for aircraft noise damage (see p 854, supra), we believe it would be anomalous to construe the subject de jure easements as not encompassing the aforesaid right to make noise without liability, particularly in view of their unlimited nature (see pp 847-848, supra.) The instant easements are not otherwise defined in their taking maps or elsewhere and we thus believe they can only be defined in terms of their generally understood and judicially determined meaning. If the State wanted them to have some new, different meaning, it should have so specified in the taking maps. It has not done so and we therefore find that through the subject avigation easements the State has formally acquired,, in addition to the other rights necessarily inhering in such easements, the right to make noise similar to that acquired in inverse condemnation suits.
In sum, before the takings the State had the right (under the F.A.A. Act and regulations) to fly over claimants’ properties, but not the right to make damage-causing noise without liability. After the takings, it had the said right to fly over (under Federal law and under the easements) and also had the said right to make noise (under the easements, to the extent of the proven noise). There can be no question aircraft noise, and any would-be market value damage resulting therefrom, are consequences of the use of the subject easements (see, generally, 4A Nichols, Eminent Domain, § 14.244) and the *856 legal effect of the easements is to relieve the State of present and future liability for such consequences (to the extent of the noise shown). Thus, while in one sense these consequences may be described as resulting from increased air traffic and jet usage, in a legal sense they and their post-taking liability-free status are results of the takings for which claimants are constitutionally entitled to just compensation (assuming of course that proper damages are shown to exist).
We note it appears the State did not need full avigation easements to fulfill the supposed purpose of the takings (to obtain Federal funds) since the Federal regulations applicable thereto indicate that only an obstruction clearance easement with right of entry was required (see p 850, supra). Such a limited easement would not have required consideration of noise damage. Nonetheless, the subject takings must be construed according to their terms as written and the damages resulting therefrom must be evaluated on the basis of what the State actually took. The fact it may have taken more than it needed provides no basis for circumscribing the said damages. (See Wolfe v State of New York, 22 NY2d 292, supra.)
It should also be pointed out that the right to make noise acquired by the State herein is a finite, specific one, comprehending no more than the noise levels shown. This is a consequence of the general rule that while eminent domain consequential damages arising from the State’s use of the appropriated property will not be barred merely because of the futurity of such use (and the futurity of such damages), these damages must be reasonably probable and reasonably ascertainable. (See Manlius Center Rd. Corp. v State of New York, 49 AD2d 685, 686; 4A Nichols, Eminent Domain, § 14.241[3].) It would of course be improper speculation for this court to award damages arising from noise levels beyond those occurring in the reasonably foreseeable future and which could be predicted with reasonable certainty.
We realize that this limited consideration of damages, while factually necessary and legally required, does have the effect of imposing a limit on the right to make noise acquired under the subject takings. However, we see no alternative to this judicial delimitation of these easements since their avigation aspect requires them to be treated somewhat atypically, at least with respect to noise. The recent Concorde-S.S.T. cause celebre highlights the rapid and radical changes that inhere in aircraft technology, particularly with respect to noise. This *857 court would be paying dangerous homage to outmoded and inapplicable rules if we ignored such changes. To construe these easements as giving the State the right to make whatever noise is necessary and incidental to overflights by whatever type of aircraft it may hereafter permit to land and take off at Republic would be giving it the right to destroy most, if not all, of the value of the subject properties. So construed, the easements would require this court to find that almost all of the properties’ market value had been appropriated and we would thus be required to make appropriate awards therefor. Neither party proceeded on this basis and we do not believe it would have been reasonable to do so. Thus while we believe avigation easements should be construed to include all the qualitative aspects of aircraft navigation (see pp 847-848, 855-857, supra), we believe the nature of the use of the easements permits and requires them to be quantitatively evaluated only on a limited and defined basis.[10]
As hereinafter explained (see pp 859-860, infra), we find the after taking noise level computations of both parties improper. However, the data underlying defendant’s 1979 computations appear to have been based on reasonable forecasts. Nothing was presented to indicate that the said six-year post-taking period was other than in the realm of reasonable foreseeability and, from the testimony of defendant’s engineer and other evidence, it appeared he did not believe forecasts beyond that period could be made with reasonable engineering certainty. Accordingly, we have accepted defendant’s 1979 projection of aircraft traffic and mix as the reasonable limits of the right to make noise under the subject easements. We believe this projection provides adequate data to enable appropriate noise level computations to be made and enable both condemnor and condemnee to understand the quantitative noise limits of the subject easements. To the extent possible, the right to make noise aspect of the subject easements is adequately defined thereby. (See Town of East Haven v Eastern Airlines, 470 F2d 148, 150-151.) With such definition, claimants will be able to act upon any future damage-causing increase in noise damages which imposes an additional servi *858 tude upon their properties. (See Avery v United States, 330 F2d 640, 642-643; see, also, 3 Nichols, Eminent Domain, § 9.21.) Such definition will also enable the State to forecast the liability resulting from any noise increases it permits, and its recently reaffirmed right to regulate noise from aircraft using Republic (see British Airways Bd. v Port Auth. of N. Y., 558 F2d 75, supra) will allow it to control or totally avoid such liability. We shall now discuss the parties’ noise evaluations.
In their noise evaluations the parties utilized what are called NEF (Noise Exposure Forecast) contours. As the court understands them, these contours are theoretical estimates of the integrated noise resulting from a given pattern, mix and amount of aircraft overflights. They are measured in terms of the effective perceived noise levels (EPNLs) of each type of aircraft using the airport. The calculation of these contours apparently involves sorting the various types of aircraft into classes having similar noise characteristics, weighting each class according to the numbers thereof (i.e., the aircraft mix) and plotting the weighted noise levels for each class according to the landing and takeoff patterns actually used. These patterns seemingly incorporated the heights the aircraft actually passed over the subject properties when following the applicable glide angle planes, such planes apparently being correlated with and above (a) the F.A.A. obstruction clearance plane before the takings, and (b) the general avigation easement plane herein after the takings. In any case, these noise level plots for each class were corrected for night flights (the noise levels for such flights being increased to reflect the presumed higher level of annoyance resulting from noise at night) and then added logarithmically. These corrected figures were then converted to NEF values (which differ from the said corrected EPNL figures by a constant of 75, presumably to avoid confusion between the two types of noise values) and NEF contours drawn. These contours thus graphically delineate the noise levels for areas proximate to the runway approaches on the basis of average use for a given period (here, annually).
Claimants’ noise expert derived what he purported to be the actual noise levels before and after the takings, while defendant’s engineer found what he considered the maximum theoretical such noise levels. Claimants’ NEF values were for 1972 and 1980 and defendant’s for 1973 and 1979. The after taking values (for 1979 and 1980) were projected NEFs based on *859 forecasts of the number and types of aircraft using Republic in said years. The 1972 and 1973 values were based on airport figures of actual aircraft operations. Various defects in both parties’ computations made it impossible for the court to use the final NEF values of either side as proper noise level guides.
Considering claimants’ NEFs first, their expert found both subject properties to lie on the NEF 30 contour before the taking and between the NEF 30 and NEF 40 contour after the taking (i.e., as of 1980). His NEF values were overstatements of the actual noise levels at the subject properties for at least two reasons. First, claimants’ expert used the total number of Republic flights even though at least 10% thereof did not pass over the subject properties because they were to and from the other Republic runway. Second, the weighting of the NEFs for night flights did not seem proper for these commercial-industrial properties since said properties were generally not used at night. Although no specific evidence was adduced on this issue, it appeared from the existing uses of each property that the Kupster property would not be used at all at night and the Schettini restaurant would only be used for a part thereof. Claimants’ expert opined the first factor would have only a marginal effect on his NEF values, but he was not questioned relative to the second factor and his computations were not demonstrated sufficiently for the court to independently determine the effect of said factor. Other factors, mentioned in defendant’s noise report and not specifically rebutted, could also have inflated claimants’ before and after NEF values. Additionally, claimants’ after NEF values were stated in their reports to have been based on forecasts derived from national averages of airplane usage compiled by the Federal Environmental Protection Agency. We believe such generalized averages, not shown to be specifically applicable to or accurate for the subject airport, do not provide the reasonable probability and certainty required for the computation of damages herein (see p 856, supra).
Finally, claimants’ expert testified that his NEF values were in part based on a prior report concerning Republic and other airports by a "very good” noise authority. This report stated that "[w]hile NEF contours have utility for the public planning of land development in the vicinity of airports, they * * * are not designed to be used for the assessment of damages on individual pieces of property.” The nature and *860 source of this conclusion raise further doubts as to the subject NEF evaluations, notwithstanding the fact claimants’ expert stated he did not agree with the conclusion.
Turning to defendant’s NEF figures, its engineer found both properties to be on a NEF 40 contour before the taking and a NEF 42 contour after (i.e., as of 1979). As noted, this engineer’s values were intentionally computed at a maximum, due not only to the two factors discussed above (which factors said engineer specifically referred to in his report) and the other mentioned factors, but also because all his calculations were purposefully on the high side. However, we are concerned here with actual damages resulting from actual noise levels, not hypothetical damages resulting from theoretical maximum noise levels. Thus defendant’s NEFs are not usable in the ascertainment of noise damages either.
Nevertheless, we note the 1979 projections of aircraft traffic and mix on which defendant’s after NEF values were based were derived from Republic’s actual trends and experience, not national averages. Thus these projections were properly related to the specific airport and properties at bar. Accordingly, while the NEFs themselves are not usable herein, defendant’s projections on which its engineer’s NEFs were predicated do provide a proper basis for the determination of the noise levels encompassed within the subject easements (see pp 857-858, supra).
Having found that the NEF calculations do not furnish a proper basis for the ascertainment of noise levels, we must observe that this finding has importance primarily in connection with the above-noted noise limits of the easements taken. The inadequacy of the NEF values has constrained the court to use the underlying data (i.e., defendant’s 1979 aircraft traffic and mix projection) rather than the more convenient NEFs as the basis for said limits. However, said inadequacy was only one of several evidentiary problems with respect to the would-be proof, particularly that of claimants’, on the existence and amount of market value noise.
A more basic problem was the failure to demonstrate any usable relationship between the found NEF values and the market values of the particular subject properties. The report of defendant’s engineer concluded the two NEF after taking change he found would not be significant enough to produce a change in the noise reaction of people using the subject property. This conclusion was apparently based on "experi *861 ence” (described in a noise publication used by the State’s engineer) that indicated a noise level change of less than 5 decibels would not produce a significant change in the general reaction to noise.[11] However we are concerned with market value effects, which may or may not have a direct relationship to people’s reaction to noise.[12]
Nonetheless, the court notes that this engineer’s report also stated that NEF values have an accuracy of +5 NEFs and, consistent therewith, he testified at trial that he did not consider the 2 NEF change he found to be significant. Since it cannot be determined whether the parties’ before and after NEF values were each equally inflated by the various above noted factors (see pp 859-860, supra), the court cannot be certain whether the actual NEF change herein was more or less than the +5 NEF margin of error.[13] However, this said margin of error does point up the fact that NEFs are only approximate indicators of noise levels and thus usable in market value determinations, if at all (see p 859, supra), only where sizeable changes thereof are demonstrated.
Turning to claimants’ attempt to relate their found NEFs to market value, many defects can be noted. First was the generalized criteria their noise expert used to derive the putative post-taking changes in use resulting from his would-be NEF increases in noise levels. From an E.P.A. report, he took a table correlating the compatibility of various land uses with three NEF spectrums, to wit, (a) outside NEF 30, (b) between NEF 30 and 40 and (c) inside NEF 40. He then superimposed on these three spectrums three degrees of acceptability from a Federal Department of Housing and Urban Development publication of guidelines for laymen to use in assessing the "exposure of a housing site to present and future *862 noise conditions.” Both these sources were obviously based on national averages and absent a showing the subject properties’ land use compatibility to noise coincided with these national averages, we find them of little probative value. This proceeding is concerned with specific commercial and industrial properties in a particular area of the country and data putatively probative of such properties’ market value should be shown to be directly and specifically comparable thereto. The residential focus and purpose of the H.U.D. guidelines compounds the noncomparability of claimants’ land use criteria. Further, the purpose of and basis for the E.P.A. tables were not shown and there was thus no way for the court to ascertain if the H.U.D. guidelines were compatible therewith. Accordingly, the mongrel criteria derived by claimants’ expert therefrom may at best be misleading and at worst completely useless for the purpose of this proceeding.
Finally, claimants’ expert did not even follow his own supposed criteria in evaluating the subject properties. Said criteria indicated that commercial and industrial uses were compatible between the 30 and 40 NEF contours and that office use was compatible within said contours with the inclusion of needed noise controls.[14] As mentioned, claimants’ map showed both properties between said contours after the taking and on the NEF 30 contour before the taking. Yet, in his report, claimants’ engineer described their location as subject to higher noise levels and then, without explanation, found before and after ranges of use different from his supposed criteria. He characterized the Kupster property as "at the edge” of his pre-taking NEF 30 contour and "at the edge” of his post-taking NEF 40 contour. He placed the Schettini property "inside” his pre-taking NEF 30 contour and "close to the edge” of his post-taking NEF 40 contour. As to both properties’ before uses, he found any residential use for them should be limited to apartments, with noise controls, and not single dwellings, while his "criteria” indicated no such limitations. More significantly, after the taking he found that not only office use but also commercial use required noise controls. He also added that Kupster’s industrial use could only be for an industry noisy enough to mask the airplane noise, unless the Kupster building was soundproofed. His "criteria” attached no such conditions to commercial or industrial use. As *863 noted, there was no explanation or evidentiary support for these new uses claimants’ expert came up with.
Accordingly, based on all the foregoing, we find the report and testimony of claimants’ noise expert wholly inadequate as proof of the existence of noise damages, much less their amount, and no other evidence herein indicated such damage.
Claimants’ real estate expert testified specifically that he relied on said noise report in assessing noise damage and the above-found inadequacy of the report by itself requires the rejection of said expert’s findings of such damage. However, other deficiencies in this appraiser’s evaluation should also be pointed out.
First, he used a cost-to-cure approach which was not properly supported. It is clear that before such an aid to the assessment of consequential damage can be utilized, it must first be shown that the cost-to-cure (and any remaining consequential damages to the property as cured) are less than the consequential damages to the property as cured. (See Goldsmith v State of New York, 32 AD2d 607, affd 26 NY2d 899.) Claimants’ appraisals clearly do not contain this prerequisite showing and it is also clear claimants’ appraiser and counsel were both unaware of the need therefor until after the commencement of trial, when this deficiency was pointed out to them by the court. Claimants’ appraiser attempted to remedy this omission by subsequent testimony at trial wherein he found uncured after values of $337,000 ($124,000 for land and $213,000 for building and, apparently, land improvements) for Kupster and $51,500 ($51,500 for land and zero for building and land improvements) for Schettini. His attempt obviously failed for the Kupster property since his damages as cured, $187,000, were not less than those resulting from the said uncured after value, $138,000. As to Schettini, his conclusion that the uncured improvements would have no after value is subject to serious doubt, even under claimants’ noise expert’s faulty analysis which was the supposed basis therefor.
In any event, we believe this testimony on uncured after values (and uses[15]) violated that part of this court’s appraisal rule which precludes proof of matter not in the appraisals. (Rules of Court of Claims, rule 25a, subd 5, par [a], 22 NYCRR *864 1200.27 [e] [1].) At trial the court allowed such testimony, over the State’s strenuous objections, primarily because of the representations of claimants’ appraiser that his uncured values were based on matter in his reports and also because the State was sufficiently apprised of the possibility of such testimony since the subject appraisals were clearly based on cost-to-cure approaches. However, upon a closer examination and analysis of claimants’ appraisals and the relevant testimony, we believe the cost-to-cure evidence presented at trial cannot legitimately be considered as within the filed appraisals. While the respective costs to cure were clearly that, claimants’ appraisals listed them as direct damages and gave no indication of the uncured uses and values which were presented for the first time at trial. Thus counsel’s objection and claim of surprise was proper since the filed appraisals gave insufficient information to allow the State to prepare for said testimony or offer rebuttal evidence of its own. Since we have found the testimony ineffective with respect to Kupster and unsupported with respect to Schettini, the State suffered no prejudice. Nonetheless, in the interests of clarifying the record, we note that the testimony of claimants’ appraiser on uncured values and uses has been excised from our deliberations herein.
Without such testimony claimants’ after valuation and damages of course cannot be accepted, but one final error in said valuation should also be indicated. In his reports, claimants’ appraiser stated the costs to cure "will solve the noise problema] within” the buildings, but he then went on to set out damages resulting from the above-discussed height restrictions and from auditory damage to people outside the buildings. He quantified these damages from after values which differed from his before values only by blanket "locational obsolescence” adjustments (-10% for Kupster and -20% for Schettini). We have found the height damages evidentially unsupported and legally impermissible (see pp 852-854, supra). The alleged auditory damages were not in claimants’ noise report, but were, according to claimants’ appraiser’s testimony, "discussed” with claimants’ noise expert. The appraiser admitted he was not a medical doctor or noise expert and the substance of and basis for what was "discussed” was not put before the court. These would-be damages must therefore also be found to be without factual support. Further, claimants’ appraiser was not shown to have any experience in evaluating such *865 noise damages and thus we perceive no basis for accepting his "opinion” with respect thereto. At any rate, the absence of evidentiary support renders his adjustments for noise and the valuations based thereon improperly subjective. (See Ekorb Assocs. v Státe of New York, 41 AD2d 794, 795; Morio v State of New York, 34 AD2d 845, 846.)
The court therefore finds that the market values of the subject properties were the same both before and after the instant takings[16] and that neither said property suffered damage thereby. Accordingly, we conclude that the claims at bar should be dismissed.[17]

. The Kupster taking map records the easement elevation at the property’s southwest corner to be 132 feet above sea level or about 51 feet above ground level. This is apparently a typographical error since the 132-foot figure is significantly different from the other easement elevations shown and inconsistent with the 50:1 general easement plane (as noted above, this general plane is only 50 feet above ground at its highest point, along the plane’s ending line, which is almost 250 feet beyond the Kupster property). The court believes the proper elevation should be 122+ feet above sea level. We note we do not believe this error so tainted the instant proceedings that a different ultimate finding would result upon its correction. Both appraisers used appropriate heights (Kupster’s appraisal mentioned the 132-foot figure but concluded the easement height was 37 feet; defendant’s appraiser did not refer to said figure and used heights of 40 and 41 feet) and although claimant’s noise expert testified to an easement height of 52 feet, it seems very possible this error was not incorporated in his key calculations, the NEF contours. Further, even if it was, the subject 10-foot error probably had only a de minimis effect on said calculations and/or his and claimant’s appraiser’s conclusions. Finally, even if it did have some significant effect, we do not believe any change in this part of Kupster’s case could correct the basic failures of proof herein or change the result. Accordingly, we do not consider it necessary to reopen the trial with respect to this error. Nevertheless, we believe the State, in the interests of accuracy and to avoid possible future misunderstanding, should file an amended map correcting the error.

. The easement heights hereinabove were derived by the court from its approximations taken from the appropriation maps.

. Republic Airport was originally a private airport owned and operated by Republic Aviation Industries, in connection with its manufacture of aircraft. In 1965 Republic Aviation sold the airport to Farmingdale Company, a corporation apparently controlled by Fairchild, another aircraft manufacturer. The State’s appraiser stated Fairchild operated the airport as a public one, but it was unclear whether this occurred immediately on Fairchild’s acquisition of it in 1965. Also, it is not even certain his description of Republic as public meant the same as the regulations’ definition of "available for public use.” In any event, it is clear Republic became the latter when it was taken over by the State on behalf of the Metropolitan Transit Authority for use as a general aviation airport on March 31, 1969.

. We note defendant’s experts apparently failed to utilize the proper figures in determining the appropriate approach surface herein. They considered the approach surface to be a plane having a 40:1 slope and extending from the end of runway 14. The regulations apparently applicable to that runway indicate a plane with a 34:1 or 50:1 slope, extending from 200 feet beyond the end of the runway. (See 14 CFR 77.25 [d] [1] [iv], [v] or [vi], [d] [2] [ii] or [iii].) Since the specific authority for defendant’s figures was not adequately explained in the State’s reports or at trial, the court was not able to determine if other factors or regulations supported its figures. However, as found hereafter, the relevancy and materiality of the appropriate surface, and its underlying regulations, to the subject properties’ market value was not evidentially demonstrated. Thus the problem noted herein is moot.

. The court could likewise not find any such provisions in other Federal statutes or regulations.

. The general avigation easement plane herein apparently coincides with such a zone.

. The only property directly taken was the top 7 feet of the tree in the northeast corner of the Kupster lot. However, Kupster claimed no damages therefor and defendant’s appraiser found such taking had no effect on the market value of the Kupster property. Accordingly, there is no basis for any award of direct damages herein.

. The easement over the Schettini property cleared the air-conditioning units on the restaurant’s roof by only 14 feet, but such units were not shown to have been in existence at the time of vesting (the part of the roof they were on was that of the addition completed after the taking). In any event, there was nothing to indicate these units could not be utilized without having them extend beyond the roof or above the easement plane.

. We note that if claimants had sustained demonstrable noise damage before the taking and could show this damage was properly related to the instant takings, conceivably they could have proceeded herein (rather than or in addition to a separate inverse condemnation action) on the basis of a de facto taking arising at the time of such pre-taking damage. The date of vesting herein would then be advanced from the de jure date to the de facto date. However, claimants’ proof indicates there was no pre-taking noise damage, they made no claim therefor and, further, in response to the court’s questions, their attorney expressly represented that they were not proceeding on any de facto theory.

. The alternative is to find the said changes in aircraft technology, as well as other changes (such as in aircraft usage), make the ascertainment of post-taking noise levels so uncertain that damages therefrom cannot be found with the requisite legal certainty as a matter of law. On the record herein we are not prepared to make such an unprecedented determination and as a nisi prius court we do not consider it proper for us to do so.

. His report also concluded that the slight increase in noise levels found after taking was not due to the easement, but to the general increase in volume of overflights. This conclusion was apparently based on the engineer’s underlying conclusion that the subject easements were merely an obstruction clearance plane higher than that previously established by the F.A.A. regulations. As noted, such conclusions are erroneous (see pp 848-851, 854-856, supra).

. We also note the conclusion here is questionable on two other bases. First, the factual basis for the "experience” was not shown. Second, on questioning by the court, defendant’s engineer stated there was no direct relationship between NEF values and decibels, only an indirect one. Thus it does not necessarily follow that there would not be a significant reaction to a two NEF change merely because such reaction does not occur at less than a five decibel change.

. Although claimants’ expert did not specify the exact amount of post-taking NEF changes he found, they appeared to be in the range of three to eight NEFs.

. Claimants’ cost-to-cure report indicated the office area in the Kupster building already had such controls, i.e., an accoustical ceiling.

. Claimants’ appraiser’s uncured after values for Kupster were testified to being based on an after highest and best use solely as a warehouse. Said use for Schettini was stated to be as warehouse use or a high noise industrial use, with the existing Schettini restaurant’s size and shape making it unusable therefor.

. In view of this finding, we see no need to further extend this opinion by deriving the quantitative before and, since identical, after market values. Also, such cannot be found for Schettini on the present record since (a) there was no proof of the state of development of the addition as of vesting, or of the enhancement value of the addition in such state, and (b) both appraisers relied on the cost approach even though they both admitted the property was not a specialty. Defendant’s use of the cost approach was thus clearly wrong since he relied solely thereon (see, e.g., Vangellow v State of New York, 41 AD2d 1017; see, also, Lanzilatta v State of New York, Court of Claims, Claim No. 54498, Aug. 22, 1977, Rossetti, J.), but claimants; appraiser contended his use of said approach was proper since he supported it with an income approach. However, the rentals he used to derive his income values were of severely questionable comparability and his final before value exactly equaled his cost approach in all particulars. Thus his cost approach could be considered the one on which he solely relied. In any case, we see no point here in going into a fine legal analysis of whether something less than sole reliance on a cost approach is per se permissible for a non-specialty.

. On two separate occasions after trial, the court visited Republic Airport and extensively viewed the subject properties as well as Republic’s runways and environs.