OPINION OF THE COURT
Jeremiah J. Moriarty, J.
This claim is for damages as the result of the partial appropriation of airspace superadjacent to claimant’s real property, pursuant to section 30 of the Highway Law as made applicable by section 1299-gg of the Public Authorities Law (L 1969, ch 933), which proceeding is described as Niagara Frontier Transportation Authority (hereinafter NFTA), Greater Buffalo International Airport, Erie County, Map No. 2, Parcel No. 2.
It was stipulated by the parties that the aforesaid map was filed in the office of the Clerk of the County of Erie on October 7, 1975. The court adopts the description of the appropriated property as shown and set forth on the map so filed; reference is hereby made thereto for such description without repetition thereof. The claim was timely filed and has not been assigned or submitted to any other court or tribunal for audit or determination. The court has viewed the property.
Claimant established title to the subject property by virtue of a deed from Neal Jacobus and Edmond E. Babinsky to 3775 Genesee Street, Inc., said deed being dated March 31, 1964, and recorded in the Erie County Clerk’s office in Liber 6995 of Deeds at page 171 on May 4, 1964.
The subject is located on the southwest corner of Genesee Street and Roxborough Avenue, in the Town of Cheektowaga, New York. It is a rectangular lot with frontage of 80.05 feet on Genesee Street, and 140 feet on Roxborough Avenue, for a total area of 11,204 square feet. It is situated approximately 1,000 feet southwest of the Greater Buffalo International Airport, and 1,500 feet from the end of airport runway No. 5.
The property is improved with a one-story office type structure which was constructed in 1962, and is used for the *62 executive and general offices of Jacobus and Babinsky, Consulting Engineers. The structure is approximately 15 feet in height (the building is 12 feet high and an air conditioning unit located on the roof extends an additional 3 feet), and has an area of 2,400 square feet, plus an additional 650 square feet of basement area. The north, east and west walls are concrete block. The front interior of the structure contains two executive offices, a small conference room and an open secretarial area, all of which are paneled and carpeted. There are also restrooms for men and women. The remainder of the main floor area is utilized as a drafting room. It has a tile floor and ceiling, and ceiling-hung fluorescent fixtures. The basement is utilized as a storage and conference room area.
Land improvements include a paved parking surface at the rear of the building and a lawn area.
Subject is zoned M-l, which is a light manufacturing district. Use of the property is in conformity with the zoning requirements. The zoning ordinance requires a minimum setback of 10 feet, and limits maximum height to 50 feet. In addition, one parking space is necessary for every 200 feet of gross floor space.
The taking is of a permanent easement for avigation in compliance with the Federal Aviation Administration (hereinafter FAA) regulations, part 77. Generally, the easement is for the use and benefit of the public and for the safe unobstructed passage of aircraft through the airspace at and above the easement plane. That plane is located at 698 feet above mean sea level, and claimant has effectively lost the right to use the airspace above that plane. Since claimant’s property, at ground level, is 664 feet above mean sea level, and since claimant alleges a right to develop its property to a height of 50 feet, or 714 feet, above mean sea level, it contends that it has been deprived of the top 16 feet of its airspace, and seeks "direct” damages of $12,000 therefor. Claimant further seeks severance damages of $28,000 to the structure, from the noise and backwash of jet overflights, and from inhibitions placed upon vertical enlargement of the building as a result of the lost airspace.
Claimant alleges a before value of $125,000, an after value of $85,000 and damages of $40,000. The State’s appraiser opines a before and after value of $70,000, and finds no compensable damage.
The first issue which must be examined is whether the *63 taking of a permanent avigation easement constitutes a directly compensable taking of 16 feet of airspace. Claimant’s appraiser postulated a theory of valuation which, to this court, is novel. Rather than derive a land value on a unit of area basis (such as acre or square foot), he considered subject land in its three-dimensional capacity, and developed a value based upon a unit of volume, cubic feet. He did this by assuming that, based upon the zoning ordinance, the land was useable to a height of 50 feet, and also based upon an allowance for substructure development, to a depth of 8 feet. Thus, his dimensional analysis comprised a volume of 80.05 feet by 140 feet by 58 feet, or 650,006 cubic feet. He proceeded to compare subject with sales of allegedly comparable properties, to derive a unit value of $.07 per cubic foot for subject, for a total "cubic content value” of $45,000 (rounded). He valued the "after space”, which consisted of 470,745 cubic feet, after allowance for the taking of the top 16 feet of airspace, also at $.07 per cubic foot, for an after value rounded to $33,000. He thus found direct damages of $12,000.
Whether direct damages can be awarded for the loss of airspace is an issue of first impression in the Court of Claims. A review of the case law of eminent domain, in relation to aviation, indicates that there is no precedent upon which to base such an award. Likewise, there is no case law, or statute, which specifically bars compensation. Prior cases concerned with the problem of overflights have either proceeded on a theory of nuisance or trespass, in which case no actual taking and only damages are alleged, or on a theory of inverse condemnation, in which case the reasonable use of the land over which the invasion occurs is substantially impaired, resulting in a de facto taking of an avigation easement for which compensation is required. Where there has been a de jure taking of an avigation easement, as in the present case, direct damages are awarded when the removal of any structure is necessitated by the terms of the easement. However, no direct damages have been awarded (or as far as this court can discern, claimed) for the taking of the unoccupied airspace above a property owner’s land. While previous case law has recognized varying degrees of ownership that a landowner may assert over the superadjacent airspace, no case in the area of avigation has specifically considered whether the airspace, apart from the underlying land, is property of value to the landowner, and for which compensation is required. In *64 the past, compensation has been measured by the diminution in the market value of the land that results from the taking of the airspace.
In order to prevail in a claim for direct damages, the claimant must establish first that it owns the airspace in question. Second, the claimant must prove that the 16 feet of airspace has a market value independent of the underlying land, so that an award of consequential damages would not constitute adequate compensation. We conclude that, although the claimant has established ownership of the airspace, it has not demonstrated that the airspace has any value other than in connection with the use of the land. Therefore, the proper measure of damages is the diminution in the value of the land and/or improvements incurred as a result of the taking of an avigation easement.
Insofar as the claimant’s assertion of ownership to the upper 16 feet of airspace is concerned, the State argues that the FAA regulations applicable to the claimant’s property constitute a prior taking. (Federal Aviation Act of 1958, US Code, title 49, § 1348; 14 CFR Part 77.) According to the defendant, these regulations require a 50:1 approach to departure clearance surface (for every 50 feet traveled horizontally, ascend 1 foot), which would intersect the claimant’s property at an altitude of 36 to 38 feet. It is the State’s position that the FAA regulations have already set a ceiling on the property comparable to the terms of the easement, and therefore, the claimant is not entitled to direct and/or indirect damages resulting from the height restriction.
Under the FAA regulations, subpart B (14 CFR 77.11, 77.13), the claimant is required to give the FAA notice of construction which would extend higher than 36 feet. The FAA would then proceed to make one of three findings (14 CFR 77.19): 1. That the construction will not exceed the obstruction standard determined pursuant to subpart C, and therefore is not a hazard to avigation; 2. That the construction will exceed the obstruction standard but will not be a hazard to avigation; 3. That the construction will exceed the obstruction standard and that a study pursuant to subparts D and E must be conducted to determine whether it presents a hazard to avigation. After this study the FAA may issue a finding of a safety hazard. It is the State’s position that the possible finding of a hazard has already effectively limited the claimant’s ownership to an altitude of 36 feet.
*65 The State’s argument is unsupported by case law, and we conclude that the FAA regulations do not constitute a prior taking of the claimant’s property. This position is in accord with the conclusion reached in Kupster Realty Corp. v State of New York (93 Misc 2d 843) where it was determined that a finding of a hazard would have no effect upon the market value of the properties there in question, since such a finding is only advisory. There are no regulations which authorize the enforcement of a hazard finding against a private landowner. The FAA cannot issue a cease and desist order preventing construction. (Illinois Citizens Committee for Broadcasting v F.C.C., 467 F2d 1397.) It can only seek voluntary compliance by a private landowner. (Air Line Pilots' Assn. Int. v Department of Transp., FAA, 446 F2d 236.) The State argues, however, that a finding of hazard has legal significance in that the landowner would have difficulty in obtaining a building permit from the town and insurance for the building. While this might be the case, there is no evidence in the record to support this argument.
Furthermore, in Griggs v Allegheny County (369 US 84) the United States Supreme Court reasoned that despite certain amendments to the Federal Aviation Act of 1958 (72 US Stat 739; US Code, title 49, § 1301, subd [29]) which define navigable airspace to include the airspace required for takeoff and landing, the landowner has a right to the airspace above the land. Without this right, title to the land would be meaningless. If substantial interference with the use of the surface results from the approach and departure of an aircraft, the landowner is entitled to compensation for inverse condemnation, not from the Federal Government, but from the municipal airport operator. It is the airport operator who bears the cost of acquiring the necessary clearance zones to comply with the FAA standards. The Federal policy is "not to have the Federal Government assume any liability relative to takeoff and landing rights” (Kupster Realty Corp. v State of New York, supra, p 849). Therefore, the prescribed FAA clearance zone regulations do not constitute a prior taking by the Federal Government.
Finally, it is not clear from the record whether a finding of a hazard would result if the claimant notified the FAA of an intention to build up to the 50-foot maximum. According to the testimony of John A. Striegel, Chief Authority Engineer for the NFTA, two clear zone ratios are used; one of 50 to 1, *66 and another of 34 to 1. The 34 to 1 ratio intersects the claimant’s property at an altitude greater than 50 feet. Mr. Striegel testified that the NFTA makes an effort to remove everything that projects above the 34 to 1 ratio, the minimum altitude at which planes will fly, barring a drastic condition. Structures below this altitude, but not above the 50 to 1 slope, which intersect claimant’s property at 36 feet, are not removed but are only lighted. Therefore, on this record it appears that, even if enforced, the FAA regulations would not bar the erection of a structure up to the 50 feet established by the zoning ordinance.
Since there was no prior Federal taking of this airspace, there is no impediment to the claimant’s assertion of ownership of the airspace above its land, a right long recognized as a property interest of the underlying landowner. Many legal theories have been developed to define the extent of a landowner’s property interest in the superadjacent airspace.[1] The extremes, that he owns all air above his property, or only that which he actually occupies, can be rejected out of hand as illogical, impractical and unworkable, in view of the continuing intensification of the use of airspace in modern times. Under any of the more moderate formulations which recognize ownership to a fixed height, or to a height which can be effectively possessed by the landowner,[2] claimant would be recognized as having a property right in the airspace to a height of 50 feet. There is no argument, once having resolved the FAA matter, that the claimant owns the airspace in question.
Despite the fact that it is airspace that is literally taken when the State appropriates an avigation easement, compensation has been based on the consequential damages to the land, or the improvements thereon. This is true whether actions are brought in trespass and nuisance, or inverse condemnation. The fact that it is the diminution in the value of the land that is compensable is made evident by studying United States v Causby (328 US 256), the first case to recognize inverse condemnation as a remedy for the landowner. The United States Supreme Court held that frequent and regular flights at low altitudes, which resulted in the destruction of a property’s use as a commercial chicken farm, consti *67 tuted a taking of property within the meaning of the Fifth Amendment. Justice Douglas, writing for the majority, concluded (pp 264-265) that in order for the landowner to have full enjoyment of the land he has a right to the "exclusive control of the immediate reaches of the enveloping atmosphere * * * The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land * * * The fact that he does not occupy it in a physical sense — by the erection of buildings and the like — is not material. As we have said, the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it * * * The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface.” (See, also, Griggs v Allegheny County, 369 US 84, 88-89, supra.)
The claimant argues, in its memorandum of law, that Causby and Griggs support an award of direct damages for airspace where a taking has occurred. However, this is reading Griggs and Causby too broadly. Neither case recognizes airspace itself as a compensable interest. In both cases the overflights were such as to render the land totally unfit for its current use. In Causby, the land was destroyed for use as a commercial chicken farm because 6 to 10 chickens per day would die by hurling themselves against the wall from fright. Similarly, in Griggs, the overflights made the plaintiff’s residence uninhabitable. In both cases compensation was ordered because the value of the land had been diminished. Damages were based on the extent to which the invasion of the airspace interfered with the reasonable use of the surface. Thus, the award was for consequential damages, not for the airspace itself.
In the area of avigation, research has disclosed no case which expressly recognizes the claimant’s right to direct compensation for the airspace. There is, however, a line of cases, the theory behind which could arguably support an award of direct damages. In Batten v United States (306 F2d 580, cert den 371 US 955, reh den 372 US 925) the plaintiffs sought relief for the vibrations and smoke which invaded their homes, as a result of nearby flights by aircraft which did not *68 pass directly over their property. The court concluded that without a direct overflight there was no physical invasion of property, and therefore no compensable taking under the Fifth Amendment. The case supports the notion that trespass is required for relief in inverse condemnation, while the creation of a nuisance alone will not support a finding of a compensable taking.
It could be argued that Batten stands for the proposition that airspace is a property interest directly compensable in inverse condemnation. For example, if the flights had been directly overhead, and the damage to the land remained a constant, it is conceivable that the court could have found a taking. Therefore, the taking and use of airspace in and of itself would appear to be part of the basis on which compensation would be made. Although this is a legitimate reading of Batten, and would support the instant claim for direct damages, the concept of airspace as a compensable interest was not the rationale upon which the decision was based. First, it is not at all clear from the opinion that, had there been direct overflights causing the same degree of damage, it would have been sufficient to find a taking in inverse condemnation: "In the instant case there is no total destruction and no deprivation of 'all or most’ of the plaintiffs’ interests. The plaintiffs do not suggest that any home has been made uninhabitable”. (Batten v United States, supra, p 585.) Secondly, Batten represents an attempt by the court to limit the liability of public airport operators, by imposing a strict requirement of direct overflights. The court balanced the public interest in aviation against the interest of the individual landowner. Finding a compensable taking without direct overflight would open up too wide a category of potential claimants against the Government. Following this analysis, it is clear that Batten did not turn on the recognition of airspace as a directly compensable property interest.
In addition to this interpretation of Batten, case law has developed which clearly reaffirms that, as in Causby, compensation is for actual damages to the use of the land, and not for a taking of airspace. In Thornburg v Port of Portland (233 Ore 178) and Martin v Port of Seattle (64 Wn 2d 309, cert den 379 US 989), the Oregon and Washington Supreme Courts, respectively, held that a nuisance could constitute a compensable taking, without the actual physical invasion of the airspace by direct overflights. Under the Thornburg-Martin rationale, it is *69 conceivable that a court could find no taking where there is direct overflight, but find a taking of property immediately adjacent, but not subject to overflight. While this is unlikely, it highlights that it is the diminution in the value of land for which compensation is made, and not for any independent right to the airspace. This development weakens the claimant’s argument for direct damages because it emphasizes the land, and not the air, as the compensable property interest.[3]
Finally, the fact that this is a de jure appropriation, rather than a de facto taking, has no bearing on the measure of damages to be utilized in this case. The first case in New York to deal with a formal de jure appropriation of an avigation easement is Kupster Realty Corp. v State of New York (93 Misc 2d 843, supra). In Kupster, the claimant did not request direct damages for airspace, nor were any awarded.
The facts in Kupster indicate that the easement provided for a right of way at a height approximately 10 feet lower than the maximum building height of 50 feet established by the zoning ordinance. However, the court did not consider compensation for the taking of an airspace to be an issue. The court did examine whether the FAA regulations applicable to the property constituted a prior taking of airspace, and reached the same conclusion arrived at herein. Once the court determined that the FAA regulations did not constitute a prior taking, the analysis did not focus on what the value of the air was to the landowner. Instead, the court proceeded to what it characterized as the "central concern” in the case, the issue of consequential damages. In a footnote the court stated: "The only property directly taken was the top 7 feet of the tree in the northeast corner of the Kupster lot. However, Kupster claimed no damages therefor and defendant’s appraiser found such taking had no effect on the market value of the Kupster property. Accordingly, there is no basis for any award of direct damages herein.” (Kupster Realty Corp. v State of New York, supra, p 851, n 7.) This is a further indication that where there is a de jure appropriation of an avigation easement, as in the instant case, compensation is for impairment of the market value of the land, and the removal of any existing structures from the airspace.
*70 In conclusion, it is obvious that the measure of compensation for the taking of airspace is the consequent diminution of the fair market value of the land and improvements, if any. The air itself is a property right without discrete value. Although in some situations airspace has been recognized as a separable and valuable property interest (such as in the area of transfer of airspace development rights[4] and in urban areas where airspace is leased for light and air),[5] those situations imply a use of the airspace to enhance the value of superadjacent or adjoining land. It is suggested that consideration for the sale, or lease, of various forms of air rights is not determined on a cubic foot basis (as is urged by claimants here), but is determined upon the extent that the loss of use of airspace detracts from the market value of the land of the seller, and enhances the value of the land of the buyer. The arithmetic manipulations of claimant’s appraiser, while compelling at first blush, do not withstand analysis, and must be rejected. The court concludes that an award of direct damages for the taking of airspace is unwarranted. Any impairment to the utility of the land, or improvements, by virtue of height restrictions, or noise, is properly assessed as an element of consequential damages. An award of direct damages for the airspace taken would only duplicate the award for consequential damages, if such are found.
The next issue which must be explored is whether the claimant is entitled to an award of consequential damages arising from the taking of 16 feet of airspace above its land. The claimant alleges that the avigation easement taken by the State has reduced the market value of the remainder of the property by $28,000. The alleged damages are a result of the height restriction imposed by the easement, and the increased noise levels that will result. In response, the State alleges that subject property has suffered no compensable damages. It argues that the height restrictions were previously imposed by the FAA regulations, and noise is noncompensable. At the outset, the court notes it is well established that, if proven, consequential damages for diminution in the *71 value of property as a result of height restriction, and noise, from the imposition of an avigation easement, are legally compensable. (Kupster Realty Corp. v State of New York, 93 Misc 2d 843, supra.)
Insofar as consequential damages for the imposition of a height restriction to 34 feet is concerned, the State’s position is that the FAA regulations imposed a prior, comparable servitude upon the use of the land. This argument can be quickly dismissed based upon the court’s interpretation herein of the effects of those regulations. With this question resolved, analysis must focus on the highest and best use of the property. If the highest and best use of the property has been altered by the taking of an avigation easement, then the claimant is entitled to consequential damages. It must therefore be determined whether the highest and best use of subject property was altered so as to cause a diminution in the market value of the land which supports an award of damages. (Kupster v State of New York, 93 Misc 2d 843, 852, supra.)
Both parties are in agreement that the property was, on the date of the taking, utilized for its best purpose. The controversy centers on whether the highest and best use is for a one-story structure as presently exists, or for a multistory structure. However, this does not present a real problem. First, even under the terms of the easement, the claimant would be able to construct a second-story addition. The building is only 12 feet high, and an additional story would be well below the 34-foot limitation. Only an expansion beyond two stories would conflict with the express terms of the easement. On the basis of the evidence presented, there is no indication that there is a market demand for three-story structures of this type. The State’s appraisal indicates that the majority of structures in the area surrounding the 3775 Genesee Street property are one and two stories. This fact is not contested by the claimant. Furthermore, it is questionable whether the claimant could add two additional floors, and still comply with the zoning ordinance parking requirement. The ordinance requires one parking space (350 square feet of land area) for every 200 square feet of gross floor space (Town of Cheektowaga Zoning Ordinance, § 5-04, subd g; § 5-11). While the appraisals and trial testimony are in conflict as to the number of parking spaces that could be provided on the premises, it is obvious that a three-story structure could not be accommo *72 dated. Three stories would necessitate 39 V2 parking spaces which would encompass 13,825 square feet. The entire property is only 11,204 square feet. The claimant introduced evidence that it has an informal agreement with the owners of a bowling alley across the street, to utilize their parking facilities during business hours. The zoning ordinance permits group parking facilities within 600 feet of a building. On this basis, the claimant contends that a third-story addition is legally feasible. The State’s position is that no formal deed, lease or contract, as required by the language of the ordinance (Town of Cheektowaga Zoning Ordinance, § 5-34) exists, and thus there is no indication that the claimant could, in fact, construct three stories, and still be in compliance with the ordinance. In this case, it is not necessary to pass on the sufficiency of the claimant’s proof with respect to the parking agreement, since there is no indication that there was market demand for a three-story structure.
The more important issue is whether the highest and best use was for a two-story structure, and whether this use has been curtailed by the easement. As already indicated, a second floor would fit within the terms of the easement. However, this expansion might no longer be reasonable if planes can fly 10 feet overhead. Therefore, it must be determined whether there was a reasonable probability of expansion which has been thwarted by the taking. The State again maintains that the parking requirement would prevent expansion. On the basis of the evidence introduced at trial, it appears that the claimant could provide adequate parking on the premises to accommodate a single-story expansion. To be in strict compliance with the ordinance, a second floor with a gross area of 2,400 feet would require a total of 27.25 parking spaces.[6] According to the State’s calculations there is only room for 18.4 spaces on the premises, while the claimant’s appraiser calculates that 31 spaces could be provided. This difference is accounted for by the fact that the State’s appraiser concluded that the 10-foot setback requirement decreased the area available for parking. The claimant’s position is that, although cars may not actually be parked in this set back area, the space may be included when computing the 350 square feet of land *73 area necessary per space, because the 350 square foot figure includes both the actual space, and room for maneuvering which is permitted in the setback area. On the basis of the practice in the area, the claimant’s method of calculation is reasonable. Calculations done on this basis reveal that the property can accommodate 25.2 parking spaces.[7] Even though technically the ordinance would require 27.25 spaces, the claimant would likely be in substantial compliance with it. This factor, in addition to the probability that a variance would be granted, and the probability that an agreement with the bowling alley could be consummated, indicate that the parking requirement would not appear to operate as a bar to the construction of a second story.
However, even finding that the parking space is adequate, the claimant’s evidence is still insufficient to show that there is a reasonable probability of expansion, or that a bar to expansion would appreciably impair the market value of the property. Lacking evidence of impairment of value, compensation is not required. In United States v 357.25 Acres of Land in Calcasieu Parish, La. (55 F Supp 461) a Louisiana District Court held that an easement imposing a height restriction does not require compensation, if, after taking into account the property’s proximity to the airport and probable use, a finding is made that no appreciable diminution in value has been incurred. In the present case, the evidence of probability of expansion is, at best, weak. Study sketches for a second story prepared by Hess and Gorey Architects, dated April 20, 1971, were introduced into evidence. These plans are inconclusive as to the probability of expansion. First, they are only very preliminary plans. They are rough sketches without the inclusion of any physical dimensions; and do not evidence any serious intent to further expand the existing structure. In addition, Mr. Jacobus, in his testimony admitted that any serious plans to expand were abandoned after this date. Thus, as of the date of the taking, expansion plans were so remote and speculative that an award of damages is unwarranted. (Oneonta Center Assoc. v State of New York, 54 AD2d 993.)
It should be pointed out that when the property was originally acquired in 1962, the airport was already in existence. Although the operations of the airport have expanded considerably since 1962, the claimant purchased the property with *74 knowledge of the presence of an airport, and therefore assumed the risk of fluctuations in market value that might be caused by the existence of a nearby airport. In this case, it cannot be said that the claimant ever had a reasonable expectation that the building could be vertically expanded. As the operations of the airport increased, the possibility of expansion diminished. This was not a result of the taking but of the risk the property owner assumed upon purchase of the property.[8] Finally, as Judge Rossetti concluded in Kupster Realty Corp. v State of New York (93 Misc 2d 843, 853, supra) frustration of business plans is not compensable.
On the basis of the preceding analysis, combined with the fact that the area is predominantly comprised of single-story structures, it has not been established that the highest and best use of the property is for other than the current use. Therefore, the height restriction of 34 feet imposed by the easement does not have the effect of diminishing the market value of the land, and an award of consequential damages is not appropriate on this record.
Insofar as the claimant’s claim for consequential damages as a result of increased noise is concerned, the State contends that such damages are noncompensable. However, this position with respect to noise is erroneous. In a de jure appropriation of an avigation easement, noise damages are compensable. (Kupster Realty Corp. v State of New York, supra, p 854; cf. Dennison v State of New York, 22 NY2d 409; City of Yonkers v State of New York, 40 NY2d 408.) Prior to the easement, the NFTA had the right to fly planes above the subject property pursuant to a grant of authority from the FAA. However, this right did not encompass the right to make noise, free from liability. If the noise reached a point where it caused substantial interference with the use of the surface, a landowner could seek compensation through an action in inverse condemnation (United States v Causby, 328 US 256, supra). Under the easement the defendant has acquired the right to make all noise necessary in connection with the operation of aircraft, free from liability. If the noise levels will substantially interfere with the reasonable use of the land, then the State must pay for the acquisition of this right. *75 Therefore, it was an error on the part of the State’s appraiser not to consider noise as a compensable factor.
Since noise damages are compensable, the focus must be whether the claimant established that the noise substantially interferes, or will substantially interfere, with the use of the land so as to require compensation. The evidence introduced at trial does not indicate that current noise levels have curtailed the claimant’s use of the property. Prior to the taking, the property was used as the office of an engineering consulting firm. After the taking, the property is being utilized in precisely the same manner. Although Messrs. Jacobus and Babinsky testified that the noise from the overflights impairs the efficiency of their operation and obliterates face-to-face conversation, there is no evidence that this damage is a result of the easement.[9] The claimant suffered from the same inconvenience prior to the taking in October, 1975. Noise that existed prior to the taking cannot be the basis upon which damages are awarded. Thus, it has been said: "Such an earlier diminution-in-value or check on further development and growth, linked to the existence of the airport and its manifold activities (including previous overflights which did not impose a servitude), cannot be attributed to the latter taking.” (Jensen v United States, 305 F2d 444, 448.)
This would not be the case if the claimant brought an action in inverse condemnation, on the basis of the noise levels prior to October 7, 1975. However, the claimant does not allege that the noise level prior to October, 1975 constituted a de facto taking.[10] Thus, the claimant, insofar as current noise levels are concerned, should not be entitled to damages. If no damages would currently be awarded for a de facto taking, no damages should be awarded for a de jure appropriation. Although the claimant contends that the nature of the action (de facto versus de jure) has bearing on whether or not damages for noise are awarded, its analysis is faulty. A damage award should not turn on who is the moving party in the condemnation proceeding. Any award must be based on the degree of interference with the land. It would be inconsist *76 ent to award damages where there is a de jure appropriation but to deny such an award (and thus a finding of a taking), where the level of noise may be significantly greater. This would result in an inequitable system of compensation.
We must also focus upon whether the claimant established that further damages arising from noise will result in the reasonably foreseeable future. If the claimant has proven that the easement will cause greater damages in the future, then an award of consequential damages is required. (Kupster Realty Corp. v State of New York, 93 Misc 2d 843, supra.) The claimant attempted to establish a predictable increase in the level of noise, by introducing into evidence statistics relating to the yearly increase in the number of tower movements, and passengers, at the Greater Buffalo International Airport. In 1977 there were approximately 8,000 more tower movements than in 1975, the year of the taking.[11] According to the NFTA Newsletter of April, 1978, this upward trend is continuing in 1978. However, this evidence alone is insufficient to establish that greater damage to the subject property will occur. The claimant failed to establish a correlation between increased air traffic, and its effect on the existing use of the premises. It is not at all clear whether this increase will render the property less suitable as the office of an engineering consulting firm. There is also no evidence that the type of aircraft that will pass over the property will be larger jets causing greater noise levels. Although the claimant established that prior to 1965, only propeller planes were used at the airport, while thereafter jets were introduced, this is irrelevant to the present taking. The issue now is whether the airport expects an increase in the numbers of BACl-lls and DC-10s (the noisiest aircraft that currently utilize the airport), or the arrival of significant numbers of larger jets such as 747s which would cause even greater levels of noise. The claimant failed to introduce such evidence.
Despite the fact that no noise damages, present or future, that warrant compensation, have been established, a problem is still lurking as to compensation for noise. Through the filing of the avigation easement, the State has acquired the "right to cause in such airspace any noise and all other effects inherent in the operation of aircraft now and hereafter used”. Generally, damages arising from an easement are *77 granted on the basis of what the State has acquired the right to do. (Wolfe v State of New York, 22 NY2d 292; Northwest Quadrant Pure Waters Dist. No. 1 v Payne Beach Assn., 38 AD2d 668; Spinner v State of New York, 4 AD2d 987.) If full effect is given to the language of this easement the claimant would be entitled to compensation for the entire value of the property. Potentially, according to the terms of the easement, SST’s could fly regularly over the subject property at 34 feet. Surely this would destroy all beneficial use of the land. Carrying this argument to its logical extreme, if compensation is to be awarded on the basis of what the State has acquired the right to do, then the damage necessary in this case would equal the full value of the property.
Nonetheless, in Kupster (supra), the court did not grant damages on the basis of the full terms of the easement. The court confined its award to the damages that were actually demonstrated, or reasonably predictable. Any other award was deemed too speculative. Simultaneously, it judicially limited the State’s right to make noise, free from liability, to the extent actually demonstrated, or reasonably predicted. The court thereby achieved an equitable balance between the competing interest of the landowner and the State. The former is protected against unforeseen, though potentially damaging "improvements” in technology, while the State’s liability is limited to actual, or foreseeable damages. This balance further serves the general public interest in curbing noise pollution. The State’s potential liability insures a continued concern that technology not be advanced at the cost of excessive noise pollution. See Avery v United States (330 F2d 640) where it was held that new and heavier aircraft flying within the terms of an existing easement constituted a new taking. (See, also, Hodges Inds. v United States, 355 F2d 592; Baxter and Altree, Legal Aspects of Airport Noise, 15 J L & Economics 1, 13-16, 17-28.)
It is the foregoing approach which must be adopted in this case. Claimant has failed to prove that its property has been consequentially damaged by the height restrictions which result from the imposition of the avigation easement, or by the noise currently generated or reasonably foreseeable. As such, the claim must be dismissed and the court now grants the State’s motion, made at the close of trial, for the dismissal of this claim.
Yet, the State’s right to make noise under this easement *78 must be limited to that shown by claimant’s noise data, insofar as frequency and intensity is concerned. To the extent that future airport operations result in an appreciable increase in the frequency of overflights, or in the intensity of the noise produced, and to the further extent that there is a demonstrable effect on market value, additional servitudes may be imposed upon claimant’s property, which will give rise to a new claim for the appropriation of a further avigation easement (Avery v United States, supra).

. Russell, Recent Developments in Inverse Condemnation of Airspace, 39 J. of Air L. & Commerce 81, Wright, Law of Airspace, p 101 et seq.

. See, e.g., 8 Am Jur 2d, Aviation, § 3.

. This court has considered the cases cited by claimant (Hoyle v City of Charlotte, 276 NC 292; Palisades Citizens Assn. v Civil Aeronautics Bd., 420 F2d 188; Indiana Toll Rd. Comm. v Jankovich, 244 Ind 574) and has found no support therein for an award of direct damages for the taking of an avigation easement.

. See Penn Cent. Transp. Co. v City of New York (42 NY2d 324, affd 438 US 104).

. See Macht v Department of Assessors of Baltimore City (266 Md 602, 605), where the Maryland Court of Appeals, in discussing the concept of the value of superadjacent mineral or air rights for tax assessment purposes, stated: "And it is obvious that when a landowner utilizes his airspace for the erection of a building, or quarries or mines below the surface, such use will ordinarily enhance the market value of his property as well as its value .for purposes of taxation.” (Emphasis added.)

. Total gross floor space with a second floor addition would be 5,450 square feet (basement 650; first floor 2,400; second floor, 2,400). The zoning ordinance requires one parking space for every 200 square feet of gross floor area (5,450 divided by 200 equals 27.25).

. 11,204 total area minus 2,400 building area equals 8,804 remaining square footage. 8,804 divided by 350 equals 25.2 parking spaces.

. We are not dealing with a case where there was no airport present when the claimant acquired the land. This would present an entirely different problem with respect to compensation. See Berger, "A Policy Analysis of the Taking Problem” (49 NYU L Rev 165).

. The claimant did not establish a nexus between the noise, and how operations are impaired. On the basis of Mr. Jacobus’ testimony it appears that the firm has only refused one job because the noise rendered the property Unfit.

. On these facts no de facto taking would be found. In Cunliffe v County of Monroe (63 Misc 2d 62) no taking was found when there was evidence of DBA readings of 85. In this case, the maximum DBA reading inside the building was 74.

. It can be estimated that between 31% and 56% of these additional flights pass over the subject property, based on statistics of runway use.